COOKE ET AL. *v.* UNITED STATES.

1. Where notes purporting to be 7-30 treasury-notes, indorsed by the holders thereof " to the order of the Secretary of the Treasury for redemption," were purchased, before their maturity, under the authority of the act of Aug. 12, 1866 (14 Stat. 31), by an assistant-treasurer of the United States, — *Held,* that the payment by him therefor did not, without the further order of the Secretary of the Treasury, retire them. Until such order be given, or until it ought to have been given, the government does not accept the notes as genuine.

2. Where such notes, indorsed as aforesaid, and sold and delivered at different times between Sept. 20 and Oct. 8 at the office of the sub-treasury of the United States in New York, were returned Oct. 12 by the Treasury Department, as spurious, to the assistant-treasurer in that city, who had purchased or redeemed them with the money of the United States, and due notice was given the following day to the party from whom he had received them, — *Held,* that there was no such delay in returning the notes as would preclude the United States from recovering the money paid therefor.

3. The ruling of the district judge, that though the notes may be printed in the department from the genuine plates, and may be all ready to issue, yet, if they are not in fact issued by an officer thereunto authorized, they do not come within the statute of Aug. 12, 1866, and the United States are not bound to redeem them, — *Held* to be error.

ERROR to the Circuit Court of the United States for the Southern District of New York.

The case was as follows: —

On the 3d of March, 1865, Congress authorized the Secretary of the Treasury to borrow, on the credit of the United States, not exceeding six hundred millions of dollars, and to issue therefor bonds or treasury-notes of the United States, bearing interest not exceeding seven and three-tenths per centum per

annum, payable semi-annually. 13 Stat. 468. Such notes were not made a legal tender. Under this act, treasury-notes to a large amount were issued by the Secretary of the Treasury, payable three years after date.

On the 12th of August, 1866, Congress, by another act, authorized the Secretary of the Treasury, at his discretion, to receive any treasury-notes or other obligations issued under any act of Congress, whether bearing interest or not, in exchange for any description of bonds authorized by the previous act of March 3, 1865, and also to dispose of any description of bonds authorized by such previous act . . . for lawful money of the United States, or for any treasury-notes . . . which had been, or which might be, issued under any act of Congress, the proceeds thereof to be used only for retiring treasury-notes or other obligations issued under any act of Congress; but nothing therein contained to be construed to authorize any increase of the public debt. 14 Stat. 31.

On each of several days, from and including Sept. 20 and Oct. 8, 1867, the defendants below (the plaintiffs in error) presented large amounts of treasury-notes purporting to be issued under the act of 1865, dated June 15, 1865, and payable three years after date to the Assistant-Treasurer of the United States at the city of New York, who purchased the amount and description of notes at the prices and premium mentioned in bills of sale made by the plaintiffs in error, and paid them therefor with the money of the United States. Such bills of sale were in the following form: —

" Sold Hon. H. H. Van Dyck, Assistant-Treasurer of the United States, No. 700, by Jay Cooke & Co., corner of Wall and Nassau Streets, Sept. 20: —

| | | |
|---|---|---:|
| $400,000, June $7\frac{8}{10}$, 107 | . . . . . . . . . . . . . . . | $428,000 |
| | 97 days . . . . . . . . . . . . | 7,760 |
| $100,000, July ,, 107 | . . . . . . . . . . . . . . . | 107,000 |
| | 67 days . . . . . . . . . . . . | 1,340 |
| | | $544,100 |

Before the delivery of the notes, the plaintiffs in error, by a stamp, which, for their convenience, they were permitted to employ in lieu of their written signature, printed on the back

of each the words, "Pay to the Secretary of the Treasury for redemption. — Jay Cooke & Co."

The notes were forwarded to the Secretary of the Treasury at Washington; and, on examination there, eighteen thereof, of one thousand dollars each, were pronounced not to be genuine treasury-notes issued by the government of the United States, and were thereupon returned to the assistant-treasurer at New York, who, on the 13th of October, 1867, duly notified the plaintiffs in error, and required them to refund the money paid for the counterfeit notes, or substitute other notes for them. On the refusal of the plaintiffs in error to comply with this requirement, this suit was brought.

The declaration contained special counts describing the cause of action as an indebtedness by the defendants to the plaintiff for money had and received by the defendants to and for the use of the United States, and of their property, which money was obtained by the defendants upon occasion of their delivering to the plaintiff what purported to be obligations of the United States known as seven-thirty treasury-notes, which were by the defendants, when they delivered them to the officer of the sub-treasury, professed to be, and by the plaintiffs and their officer aforesaid were then supposed to be, valid, genuine notes; and by the defendants' representations and inducements the same were received as valid, genuine notes by the plaintiffs and their officer aforesaid at the sub-treasury of the United States aforesaid, at the city of New York.

That the said notes were in fact counterfeit, and had never been executed or issued by the United States, but had been forged and falsely made and uttered, and were no obligations of the United States, and were by their officers aforesaid received as aforesaid under the belief created by the representations and inducements aforesaid that the notes were good, and formed an adequate consideration for the money received by the defendants, which money was retained by them from the plaintiffs after discovery that the said notes were counterfeit, whereof prompt notice was given to the defendants, that, being so indebted, the defendants promised, &c. There were also other counts in general *indebitatus assumpsit* for money had and received.

The defendants pleaded *non-assumpsit*.

Upon the trial, exceptions were taken by the defendants to the ruling of the district judge in the admission and exclusion of evidence, and also to certain portions of his charge to the jury.

A verdict was rendered in the District Court in favor of the United States for the amount paid to the defendants, with interest thereon, — $23,630.88.

The judgment of the District Court was affirmed by the Circuit Court: whereupon the defendants below sued out this writ of error.

The alleged errors relied on here were as follows: —

*First*, That the District Court erred in refusing to charge the jury in accordance with the prayer of the defendants below.

1. If the defendants honestly believed the notes in question to be genuine obligations issued by the United States, and, so believing, passed them in good faith to Mr. Van Dyck, the Assistant-Treasurer of the United States, and the latter, under the like belief and in good faith, received the notes and paid for them, the plaintiffs are not entitled to recover, although the notes may not have been genuine obligations issued by the United States.

2. That, in determining whether the eighteen notes in question are genuine obligations, the jury are entitled to take into consideration the fact that said notes were supposed to be genuine by the assistant-treasurer in New York, and passed through his hands and the hands of other officials connected with the Treasury Department.

3. That the burden of proving that the eighteen notes in question, "C 1" to "C 18," are not genuine obligations of the United States, rests upon the plaintiffs; and, if the evidence be insufficient to establish the fact that such notes are not genuine obligations as aforesaid, the defendants are entitled to a verdict.

*Second*, That the court erred in ruling, during the progress of the trial and in the charge, that defendants below were not entitled to a verdict unless the notes in question were *actually issued* under an act of Congress, and that the act of issuing such notes was a *physical act;* and that although the notes were printed in the department from the genuine plates, and might

be all ready to issue, still, if they were not in fact so issued, the defendants below were not entitled to a verdict.

*Third,* That the court erred in admitting in evidence the "K" notes which were claimed by the government 'to be genuine, and in admitting in evidence the coupons alleged to have been attached to said notes, and to have been paid by the United States.

*Fourth,* The court erred in admitting the following evidence • on the part of the United States : —

*Questions to Casilear.*   George W. Casilear, superintendent of engraving and transferring in the Treasury Department, proved that the work on the genuine " 7-30 " notes was made up under his supervision, and that the plates were engraved in the treasury-building under his superintendence, and that he did some of the engraving on the plates, and he pointed out the particular portions of his work; but the plates were not produced.

He was asked these questions : —

" 1. *Q.* From your observation of these notes, and your knowledge of the genuine plates, were these notes, ' C 1 ' to ' C 18,' printed from those plates ? "

Question objected to.   Objection overruled.

" 2. *Q.* Were those eighteen notes, ' C 1 ' to ' C 18,' printed or not from any plate referred to by you as having been got up by you under your supervision in the Treasury Department, from which 7-30 notes of the second series used by the government were printed, so far as you know ? "

Same objection.   Overruled.

" *A.* They were not."

*Questions to Cooper.*   David M. Cooper, a witness for the plaintiffs, testified that he engraved the original die from which the seals used on the alleged genuine notes were produced by what is termed the transfer process, and was asked these questions : —

" 3. *Q.* Could that die, which you engraved, have produced that seal on the counterfeit ? "

Objected to.   Objection overruled.

" *A.* It could not.

"4. *Q.* Did you ever know of a note, like those marked 'C,' to be printed from the plate from which the notes marked 'K' were taken?"

An exception was taken to this question, which was overruled, and the witness answered in the negative.

*Fifth,* That the court erred in overruling and excluding the following questions put by the defendants below:—

*Question to Holmes.* Plaintiffs below read from the letter-book of Jay Cooke & Co. twelve letters, copies of all of which, except one which was illegible, are inserted among the exhibits at the end of the case, which letters were received as admissions by Jay Cooke & Co. that these identical notes had been transferred by them to the assistant-treasurer.

The defendants thereupon offered to prove, by Philip W. Holmes, that he wrote or drafted and sent all these letters, acting on the information derived from the sub-treasurer that the statement in reference to the notes being counterfeit was correct, and without knowing about the identity of them. This was objected to, and the objection sustained.

The eighteen notes claimed to be counterfeit were introduced in evidence by the United States, and marked " C 1 " to " C 18."

*Questions to Ryerson.* U. C. Ryerson, called as a witness by defendants below, testified that he was in the transfer department of the "National Note Bureau," of which S. M. Clark was at the head for three years, from February, 1863, to 1866.

The witness was asked, —

" *Q.* Do you discover any discrepancies or differences between these two notes, which, in your experience, may not have been caused by a defect in the transfer?"

The question was overruled.

" *Q.* Look at these two notes, 'C' and 'K.' Can you state from your experience in the department, and from your knowledge of the plates there used to print the second series of seven-thirty notes, whether or not these two classes of notes — 'C' and 'K'—were printed from the same plate in different conditions, occasioned by a re-entry?"

Question excluded by the court.

*Questions to Tichener, witness for defendants.* He testified that he was a geometrical-lathe operator, and familiar with other branches of engraving.

" *Q.* Does it not sometimes occur, that, in the process of burnishing a roll, a portion of the work on the roll becomes obliterated and erased, or in other respects changed?

" *Q.* Can you, after an examination of these specimen-notes ' C' (the notes alleged to be counterfeit) and ' K' (valid notes), and, if so, state whether they were printed from the same plate in different conditions, caused by re-entering?"

Questions excluded by the court.

*Mr. J. E. Burrell* and *Mr. R. L. Ashhurst* for plaintiffs in error.

The debtor is presumed to know whether the obligations paid by him are genuine; and money paid by him to an innocent holder of them cannot be recovered.

The transaction was not a purchase of securities.

The party to whom forged obligations are passed must immediately notify the person from whom he received them, and tender the instruments. In this case, no notice was given until three weeks had elapsed, and the notes had been defaced. *Thomas* v. *Todd*, 6 Hill, 340; 2 Pars. on Contr. 265.

The liability of government for acts of its agents is unquestionable. Story on Agency, 8th ed., 307 *a; Martin* v. *Mott*, 12 Wheat. 19–31.

Seven-thirty notes have all the qualites of commercial paper. *Mercer County* v. *Hacket*, 1 Wall. 83.

*Mr. Attorney-General Pierrepont* and *Mr. Solicitor-General Phillips* for the defendants in error.

When paid, these notes were not due; and they were paid under a special authority derived from the act of 1866, ch. 39, 14 Stat. 31. By that act, the Secretary of the Treasury was to apply certain funds thereby provided "for retiring treasury-notes issued under any act of Congress." A treasury-note which originally went into circulation surreptitiously is not included in that description.

If the assistant-treasurer had no authority to redeem these notes, his action can be ratified only by Congress.

The point, that the cancellation of the notes at the treasury disables the government from recovery, is not well taken.

Mr. Chief Justice Waite delivered the opinion of the court.

The United States sued Jay Cooke & Co., in this action, to recover back money paid them by the assistant-treasurer in New York for the purchase or redemption before maturity, under the the the act of Aug. 12, 1866 (14 Stat. 31), of what purported to be eighteen 7-30 treasury notes, issued under the authority of the act of March 3, 1865 (13 Stat. 468), but which it is alleged were counterfeit. Cooke & Co. insist, that if they honestly believed the notes in question were genuine, and, so believing, in good faith passed them to the assistant-treasurer, and he, under a like belief, and with like good faith, received and paid for them, there can be no recovery, even though they may have been counterfeit.

As this defence meets us at the threshold of the case, it is proper that it should be first considered.

It was conceded in the argument, that, when the United States become parties to commercial paper, they incur all the responsibilities of private persons under the same circumstances. This is in accordance with the decisions of this court. *The Floyd Acceptances,* 7 Wall. 557; *United States* v. *Bk. of Metropolis,* 15 Pet. 377. As was well said in the last case, "From the daily and unavoidable use of commercial paper by the United States, they are as much interested as the community at large can be in maintaining these principles." It was also conceded that genuine treasury-notes, like those now in question, were, before their maturity, part of the negotiable commercial paper of the country. We so held at the last term, in *Vermilye & Co.* v. *Express Co.,* 21 Wall. 138.

It is, undoubtedly, also true, as a general rule of commercial law, that where one accepts forged paper purporting to be his own, and pays it to a holder for value, he cannot recall the payment. The operative fact in this rule is the acceptance, or more properly, perhaps, the adoption, of the paper as genuine by its apparent maker. Often the bare receipt of the paper accompanied by payment is equivalent to an adoption within

the meaning of the rule; because, as every man is presumed to know his own signature, and ought to detect its forgery by simple inspection, the examination which he can give when the demand upon him is made is all that the law considers necessary for his protection. He must repudiate as soon as he *ought* to have discovered the forgery, otherwise he will be regarded as accepting the paper. Unnecessary delay under such circumstances is unreasonable; and unreasonable delay is negligence, which throws the burden of the loss upon him who is guilty of it, rather than upon one who is not. The rule is thus well stated in *Gloucester Bank* v. *Salem Bank*, 17 Mass. 45: "The party receiving such notes must examine them as soon as he has opportunity, and return them immediately: if he does not, he is negligent; and negligence will defeat his action."

When, therefore, a party is entitled to something more than a mere inspection of the paper before he can be required to pass finally upon its character, — as, for example, an examination of accounts or records kept by him for the purposes of verification, — negligence sufficient to charge him with a loss cannot be claimed until this examination ought to have been completed. If, in the ordinary course of business, this might have been done before payment, it ought to have been, and payment without it will have the effect of an acceptance and adoption. But if the presentation is made at a time when, or at a place where, such an examination cannot be had, time must be allowed for that purpose; and, if the money is then paid, the parties, the one in paying and the other in receiving payment, are to be understood as agreeing that a receipt and payment under such circumstances shall not amount to an adoption, but that further inquiry may be made, and, if the paper is found to be counterfeit, it may be returned within a reasonable time. What is reasonable must in every case depend upon circumstances; but, until a reasonable time has in fact elapsed, the law will not impute negligence on account of delay.

So, too, if the paper is received and paid for by an agent, the principal is not charged unless the agent had authority to act for him in passing upon the character of the instrument. It is the negligence of the principal that binds; and that of the agent has no effect, except to the extent that it is chargeable to the principal.

Laches is not imputable to the government, in its character as sovereign, by those subject to its dominion. *United States* v. *Kilpatrick*, 9 Wheat. 735; *Gibbons* v. *United States*, 8 Wall. 269. Still a government may suffer loss through the negligence of its officers. If it comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there. Thus, if it becomes the holder of a bill of exchange, it must use the same diligence to charge the drawers and indorsers that is required of individuals; and, if it fails in this, its claim upon the parties is lost. *United States* v. *Barker*, 12 Wheat. 559. Generally, in respect to all the commercial business of the government, if an officer specially charged with the performance of any duty, and authorized to represent the government in that behalf, neglects that duty, and loss ensues, the government must bear the consequences of his neglect. But this cannot happen until the officer specially charged with the duty, if there be one, has acted, or ought to have acted. As the government can only act through its officers, it may select for its work whomsoever it will; but it must have some representative authorized to act in all the emergencies of its commercial transactions. If it fail in this, it fails in the performance of its own duties, and must be charged with the consequences that follow such omissions in the commercial world.

Such being the principles of law applicable to this part of the case, we now proceed to examine the facts.

The Department of the Treasury is by law located at the seat of government as one of the executive departments, and the Secretary of the Treasury is its official head. Rev. Stat., sect. 233; 1 Stat. 65. All claims and demands against the government are to be settled and adjusted in this department (Rev. Stat., sect. 236; 3 Stat. 366), and the Treasurer of the United States is one of its officers. Rev. Stat., sect. 301; 1 Stat. 65. His duty is to receive and keep the money of the United States, and disburse it upon warrants drawn by the Secretary of the Treasury, countersigned by either comptroller, and recorded by the register, and not otherwise. Rev. Stat., sect. 305; 1 Stat. 65. The rooms provided in the treasury-building at the seat of government for the use of the treasurer are by law the

treasury of the United States.  Rev. Stat., sect. 3591; 9 Stat. 59.   Assistant-treasurers are authorized and have been appointed to serve at New York and other cities.  Rev. Stat., sect. 3595; 9 Stat. 60.   The rooms assigned by law to be occupied by them are appropriated to their use and for the safe-keeping of the public money deposited with them.  Rev. Stat., sect. 3598; 9 Stat. 59.   The assistant-treasurers are to have the charge and care of the rooms, &c., assigned to them, and to perform the duties required of them relating to the receipt, safe-keeping, and disbursement of the public money.  Rev. Stat., sect. 3599; 9 Stat. 59.   All collectors and receivers of public money of every description within the city of New York are required, as often as may be directed by the Secretary of the Treasury, to pay over to the assistant-treasurer in that city all public money collected by them or in their hands. Rev. Stat., sect. 3615; 9 Stat. 61.   The Treasurer of the United States, and all assistant-treasurers, are required to keep all public money placed in their possession till the same is ordered by the proper department or officer of the government to be transferred or paid out, and, when such orders are received, faithfully and promptly to comply with the same, and to perform all other duties as fiscal agents of the government that may be imposed by any law or by any regulation of the Treasury Department made in conformity to law.  Rev. Stat., sect. 3639; 9 Stat. 60.   All money paid into the treasury of the United States is subject to the draft of the treasurer; and, for the purpose of payment on the public account, the treasurer is authorized to draw on any of the depositaries as he may think most conducive to the public interest and the convenience of the public creditors.  Rev. Stat., sect. 3644; 9 Stat. 61.

Thus it is seen that all claims against the United States are to be settled and adjusted " in the Treasury Department; " and that is located " at the seat of government."  The assistant-treasurer in New York is a custodian of the public money, which he may pay out or transfer upon the order of the proper department or officer; but he has no authority to settle and adjust, that is to say, to determine upon the validity of, any claim against the government.  He can pay only after the adjustment has been made " in the Treasury Department,"

and then upon drafts drawn for that purpose by the treasurer.

By the act of April 12, 1866, the Secretary of the Treasury was authorized, at his discretion, to receive the treasury-notes issued under any act of Congress in exchange for certain bonds; or he might sell the bonds, and use the proceeds to retire the notes. 14 Stat. 31. This exchange or retirement of the notes involved an adjustment of the claims made on their account against the government. That adjustment, as has been seen, could only be had in the Treasury Department; and the government cannot be bound by any payment made without it, through one of the assistant-treasurers, until a sufficient time has elapsed, in the regular course of business, for the transmission of the notes to the department, and an examination and verification there.

That such was the expectation of Congress is apparent from the legislation authorizing the issue of such notes. On the 23d December, 1857, an act was passed "to authorize the issue of treasury-notes." 11 Stat. 257. The payment or redemption of these notes was to be made to the lawful holders upon presentment at the treasury. Sect. 2. The notes were to be prepared under the direction of the Secretary of the Treasury, and to be signed in behalf of the United States by the treasurer thereof, and countersigned by the register of the treasury. Each of these officers was to keep, in books provided for that purpose, accurate accounts, showing the number, date, amount, &c., of each note signed or countersigned by himself, and also showing the notes received and cancelled. These accounts were to be carefully preserved in the treasury. Sect. 3. The notes were made receivable for public dues. Sect. 6. The officer receiving the same was required to take from the holder a receipt upon the back of each note, stating distinctly the date of payment and amount allowed. He was also required to make regular and specific entries of all notes received by him, showing the person from whom he received each note, the number and date thereof, and the amount of principal and interest allowed thereon. These entries were to be delivered to the treasurer with the notes; and, if found correct, he was to receive credit for the amount allowed. Sect. 7. To promote the public

convenience and security, and protect the United States as well as individuals from fraud and loss, the Secretary of the Treasury was authorized to make and issue such instructions as he should deem best to the officers required to receive the notes in behalf of, and as agents in any capacity for, the United States, as to the custody, disposal, cancelling, and return of the notes received, and as to the accounts and returns to be made to the Treasury Department of such receipts. Sect. 8. The Secretary of the Treasury was directed to cause such notes to be paid when they fell due, and he was authorized to purchase them at par for the amount of the principal and interest due at the time of the purchase. Sect. 9.

The act of July 17, 1861, "to authorize a national loan, and for other purposes," provided for an issue of 7-30 treasury-notes, and, in terms, re-enacted all the provisions of the act of Dec. 23, 1857, so far as the same were applicable and not inconsistent with what was then enacted. 12 Stat. 259, sects. 1 and 10.

The acts of June 30, 1864 (13 Stat. 218), and March 3, 1865 (13 Stat. 468), which authorized further issues of the same class of notes, did not in terms re-enact the provisions of the acts of 1857 and 1861; but they did authorize and require the Secretary of the Treasury to make and issue such instructions to the officers who might receive the notes in behalf of the United States as he should deem best calculated "to promote the public convenience and security, and to protect the United States as well as individuals from fraud and loss." 13 Stat. 221, sect. 8.

These are public laws of which all must take notice. In the absence of any evidence showing a regulation permitting an exchange or redemption of notes at any other place than the treasury, and after settlement and adjustment in the department, it will not be presumed that one was made. The notes in question are not made payable at any particular place: consequently they are in law payable at the treasury, and this is at the seat of government and in the Treasury Department. In this department the secretary represents the government. His acts and his omissions, within the line of his official duties, are the acts or omissions of the government itself; and in all com-

mercial transactions his official negligence will be deemed to be the negligence of the government. He is specially charged with the duty of retiring these treasury-notes by exchange, payment, or purchase; and he is the only agent authorized to act for the government in that behalf. All who deal with the government in respect to these notes are presumed to know his exclusive authority; for it is public law. Until such time, therefore, as he has acted, or in due course of business ought to have acted, there can have been no such laches as will charge the government. He is presumed to act officially only in his department. His attention can only be demanded after the presentation of the notes at that place. It was there that the accounts and records of the issues and redemptions under the early laws were by statute required to be kept; and that is the appropriate place for keeping such similar records as the Secretary of the Treasury may by regulation prescribe, under the later laws, to protect against fraud and loss.

Such seems to have been the understanding of the parties in the transaction which is now under consideration. The notes were "sold" to the assistant-treasurer, and were, by stamp upon their back at the appropriate place for their indorsement, made payable "to the order of the Secretary of the Treasury, for redemption." The payment by the assistant-treasurer under such circumstances, for the purchase, did not "retire" the notes. That upon the face of the transaction required the further order of the Secretary of the Treasury. Undoubtedly it was expected, that, in due course of business, that order would be given; but until given, or at least until it ought to have been given, it cannot be said that the government has accepted the notes, and adopted them as genuine.

Neither has there been such delay in returning the notes to Cooke & Co., after their receipt by the assistant-treasurer, as will throw the burden of the loss upon the government. The return should have been made within a reasonable time; and what is a reasonable time is always a question for the courts when the facts are not disputed. *Wiggins* v. *Burkham*, 10 Wall. 133. Here there is no dispute. The notes were delivered to the assistant-treasurer on different days between Sept. 20 and Oct. 8. The first suspicion in Washington in regard to their

character was Oct. 5, when a note was found, of which, upon inspection of the record, a duplicate was already in. All the notes were found and returned to New York Oct. 12, and the next day Cooke & Co. were notified.

The amount of 7-30 notes issued by the government was many hundreds of millions of dollars. Necessarily, the accounts and records of their issue and redemption were voluminous. Between Sept. 20 and Oct. 8, Cooke & Co. themselves sold to the assistant-treasurer for redemption more than $7,500,000. Other parties were at the same time making sales to large amounts. Time must be given for careful examination and scrutiny; and we do not think, that, under all the circumstances, any unreasonable delay occurred either in their transmission to or return from the Treasury Department.

We are all clearly of the opinion, therefore, that, if the notes were in fact counterfeit, their receipt by the assistant-treasurer and his payment therefor did not preclude the United States from receiving back the money paid. So far, there was no error in the courts below.

It was, however, contended by Cooke & Co., that if the notes were not counterfeit, but genuine notes unlawfully and surreptitiously put in circulation, the government was bound for their payment to a *bona-fide* holder, and consequently that there could be no recovery. We quite agree with the lamented judge of the Circuit Court who had this case before him upon error to the District Court, that the evidence tending to show a fraudulent or surreptitious issue of notes printed from the genuine plates was exceedingly meagre, and by no means sufficient to warrant a verdict to that effect; but the jury was not permitted to pass upon that question, as the district judge charged "that if the notes were printed in the department, and all ready for issue, yet, if they were not in fact issued, the United States could recover. The issue to bind the government," said the judge, "must be a physical act of an authorized officer."

It was conceded on behalf of the government, in the argument here, that, if the notes had been due when they were received and paid, this part of the charge could not be sustained. We need not, therefore, examine that question. The

notes were perfect and complete as soon as printed. They did not require the signature of any officer. As soon as they had received the impression of all the plates and dies necessary to perfect their form, they were ready for circulation and use. In this respect they did not differ from the coins of the mint when fully stamped and prepared for issue. Coin is the money of commerce, and circulates from hand to hand as such. These notes represent the promises of the government to pay money, and were intended to circulate and take the place of money, to some extent, for commercial purposes. Although not made legal tender as between individuals, they were, for their then face value, exclusive of interest, as between the government and its creditors. 13 Stat. 221, sect. 8. They were issued under the authority of "an act to provide ways and means for the support of the government" (13 Stat. 218, title) in its great peril, and they bore the "imprint of the seal of the Treasury Department as further evidence of lawful issue." Id. 220, sect. 6. Their aggregate amount was very large; and they were of all convenient denominations, not less than ten dollars. Id. 218, sect. 2. The people were appealed to, through their patriotism, to accept and give them circulation. They entered largely, and at once, into the commerce of the country, and passed readily from hand to hand as, or in lieu of, money. After the close of the war, they became, in a sense, too valuable for circulation, and were on that account, to a large extent, withdrawn, and held for investment.

But it is insisted on the part of the government, that as the act of April 12, 1866, only authorized the Secretary of the Treasury to retire, before their maturity, notes "issued" under the authority of some act of Congress, he could only take up such as were actually put out by the "physical act" of some authorized officer of the government in pursuance of law. This, we think, is too narrow a construction of the act. At the time it was passed, the war of the rebellion was over. In the prosecution of this war, an immense debt had been contracted. To meet the pressing demands upon the credit of the government, various forms of securities had been put forth, some of which, like those now under consideration, would mature at an early date, and sooner, perhaps, than they could be met with-

out the negotiation of new loans. In view of this possible contingency, Congress seems to have been desirous of meeting its obligations of this class, whenever they could be exchanged for or retired with the proceeds of the sale of certain specified bonds having a longer time to run. The object evidently was to get rid of this species of debt; and we think the act may be fairly construed to authorize the retirement of all notes of this class outstanding which the government would be required to meet at maturity.

This leads to a reversal of the judgment. There have been other errors assigned upon the rulings made in the progress of the trial as to the admission of evidence. These need not be specially alluded to. It is sufficient to say that we think there is no error here. The same may be said as to the ruling of the court upon the punching or cancellation of the notes. If they were counterfeit, the cancellation could do no harm; for they were worthless before. If they were genuine, they had already been cancelled by the payment.

*The judgment of the Circuit Court is reversed, and the cause remanded, with instructions to reverse the judgment of the District Court, and to award a venire de novo.*

MR. JUSTICE MILLER did not sit on the argument of this cause, and took no part in the decision.

MR. JUSTICE CLIFFORD, with whom concurred MR. JUSTICE FIELD and MR. JUSTICE BRADLEY, dissenting.

I dissent from the opinion of the court in this case, —

1. Because I am of the opinion that the United States are not liable for forged paper under any circumstances.

2. Because I am of the opinion that the United States are not liable for its paper-promises fraudulently or surreptitiously put into circulation, not even if the fraudulent act was perpetrated by treasury officials.