Mr. Justice Cox
delivered the opinion of the court.
J. A. Lawyer was a paymaster in the United States Army, and in January, 1866, had a large amount to his credit as *290 such paymaster in the National Bank of the Republic, the-defendant in this action, which is, and then was, a national-bank and a duly designated depositary of the public moneys of the United States.
Captain Edwin R. Brink, formerly in the army, had a claim against the government for pay and allowances, which he employed Rutger Teal & Co. to collect, giving them a power of attorney for that purpose and also a-printed voucher signed and' receipted in blank, to be filled up with the amount that might be ascertained to be due to him. As Brink testifies, and we may assume, the power of attorney did not authorize Teal & Co. to indorse any check that might be issued to Brink in the settlement of his claim-
On the 16th of January, 1866, at Washington, the paymaster, Lawyer, in settlement of Brink’s claim, issued his-check on the defendant, payable to the order of Brink, for $966.37, and sent it by mail to G-. W. Scott, said to have-been a clerk in the office of Teal & Co.
The check was indorsed in Brink’s name, presumably by Rutger Teal, to the order of Riggs & Co., and cashed by the latter.
Riggs & Co. then indorsed it to the order of the Bank of America of New York. On the 18th of January it was paid-in New York by the Central National Bank of New York and charged to the defendant, and on the 19th it was paid by the defendant and charged to the account of Lawyer - This account was subsequently settled, and this, with his other checks, was returned to Lawyer and remained in his possession until January 13, 1869.
In the settlement of Lawyer’s accounts with the United States, Brink’s receipt, which he had received from Rutger Teal was, of course, filed as one of his vouchers.
Brink, in the meanwhile, having heard nothing of the collection of his claim, had received pay from another paymaster.
The voucher filed by Lawyer made it appear that he had been paid twice. He was therefore called upon to refund.. ■At the request of the second’auditor, Lawyer, on the 13th *291 of January, 1869, forwarded the check in question to him,, and it was submitted to Brink’s inspection, whereupon he-pronounced it a forgery, and made an affidavit to that effect on the 15th of the same month.
Lawyer must have been notified of that fact, and perhaps-called upon to pay the amount — though no evidence is given, directly on that point — for on the 21st of January he wrote-to the president of the defendant bank, notifying him of the ■ fact that the check had been paid on a forged indorsement y that he would have to look to the bank for reimbursement,. and requesting him to correspond with the Bank of America on the subject and demand reimbursement.
Mr. Coyle, the president, in reply, wrote on the 28d of' January, requesting Lawyer to forward the check and accompany it with his own affidavit, together with that of Brink, that the latter’s indorsement was a forgery.
On the 27th of January, Lawyer wrote to Coyle, enclosing-his own affidavit, as requested, and stating that the check “ is now in Washington, and I will request the party in. whose hands it is to deliver it to you.”
On the 30th of January, Henry C. Harmon, Deputy Second! Auditor of the Treasury Department, according to his testimony, delivered the check and the affidavit of Brink as to» the forgery, which had been made on the 15th, as before-stated, to one of defendant’s officers.
This suit was brought in February, 1875, but the case was; not tried until June 5, 1882.
At the trial, the court held that the United States had lost its recourse against the bank by laches. The learned judge says : “ A case where the difficulty was not discovered until the lapse of three years, and then only incidentally, and where it appears that five years or more after that were allowed to elapse before any definite action was taken, shows laches on the part of the government, notwithstanding they had twelve or fifteen years before been engaged in a great war.”
And again : “ It strikes me that under all the circumstances the government has been guilty of laches in not commencing this proceeding earlier.”
*292 And again : “ Year after year passes ; the check becomes outlawed, as far as Riggs & Co. are concerned.”
And again : “It is evident that the power of indemnifying itself against prior parties to this check is lost.”
I have cited these passages from a somewhat lengthy -charge, in order to indicate the theory upon which the court instructed the jury to find for the defendant. It seemed to be partly that the laches consisted in not discovering the forgery for three years after it occurred, and partly in not bringing suit earlier.
At the same time, the court stated that “ the bank, within a reasonable time, was certainly notified of the fact, and furnished with some proof that the payee had never endorsed the note, and that he had never authorized anyone to endorse it; ” and again, “ to be sure this notice to the bank, 'accompanied with an affidavit that the endorsement of the check had been forged, w*as sufficient to put them upon inquiry, .and perhaps to enable them to pursue Riggs & Co. and the bank from which they received it.”
The argument for the defense in this court, however, has proceeded upon a different ground from that taken by the ■court below, and one directly opposed to it, viz., that the laches consisted in not giving timely notice to the bank ■so as to enable it to have recourse to antecedent parties ■dealing wfith it in reference to this check.
Before examining these questions, it may be well to notice another, which may be called preliminary, and that is, whether this suit can be maintained by the United States, or ought to have been brought, and could only be maintained, by the paymaster, Lawyer.
The affirmative was held by the court below ; the opposite has been maintained here in argument.
It is true, that the dealings of the bank were with Lawyer only. But he was an agent of the United States. ' He deposited Government funds with the defendant. These deposits w’ere, in a legal sense, loans of Government money to the bank and created a debt of the bank to Lawyer, in his character of agent of the United States.
*293 On the general principles of the law of agency, there can be no more doubt of a principal’s right to sue for and recover money of his, loaned by his agent, than of his 'right to sue for the price of his goods sold by his agent. Of course, that right may be modified by equities between the agent and the third person, where he has dealt as a principal and was supposed to be such, by the sti’anger, but no such question arises here.
Independently of these general principles, the express legislation of the United States brings the bank into direct privity with the Government. It was a national bank anct a duly designated depositary of the public moneys. As such, it was bound to receive public moneys issued to paymasters and other officers, and to perform all such reasonable duties in that character as might be required of them. Sec. 5753, Bev. Stats. They became as much the agents of the-Government as the paymasters themselves. Indeed, after a. thorough review of the legislation on this subject, Judge Blatchford, in the case of Morgan vs. Vandyck, 7 B latch., 147, came to the conclusion, with much show of reason, that, the United States only could sue a bank which was a designated depositary of public moneys for a balance due, and' that the action could not be maintained by a paymaster who had deposited the funds.
However this may be, we consider the right of the government to sue,- if it so elect, to be sufficiently clear.
What, then, is the relation of the United States to the-defendant with reference to this check?
The defendant paid this check for account of the United States, and upon exhibiting it as a voucher, in settlement of its accounts with the Government, in the person of its agent,, the paymaster received credit for it. This is precisely the same thing as if the United States had paid back the money to the bank ; and if the credit was given under a mistake of facts, there is the same right of action for money had and received that would exist if the money had actually been reimbursed to the bank by the United States. Such was the view taken by the Supreme Court in the case of the Bank *294 of the United States vs. The Bank of Georgia, 10 Wheaton, 333, where it appeared that in a case of mutual accounts, forged bills ,of the defendant had been passed to the credit of the plaintiff in account. The court said :
“We are of opinion that it is a case of actual payment. We treat it in this respect exactly as the parties have treated it, that is, as a case where the notes have been paid and •credited as cash. The notes have not been credited as notes or as a special deposit; but the transaction is precisely the same as if the money had first been paid to the plaintiffs, .and instantaneously the same money had been deposited ■by them. * * *
“ Considering, then, the credit in this case as a payment •of the notes, the question arises whether, after a payment, the defendants would be permitted to recover the money back ; if they would not, then they have no right to retain the money, and the plaintiffs are entitled to a recovery in the present suit.’’
Virtually, then, the United States have refunded to the bank money which the bank had paid for the United States on a forged endorsement, and the main question is whether the United States may recover the money as paid under a ■ mistake of fact.
The only objection alleged is laches. We can hardly suppose that the omission to discover the forgery for three years after it was committed can be pronounced by the court as laches in law.
In the case of Don et al. vs. Postmaster-General, 1 Pet., 918, it appeared that after a postmaster had been removed from office, the Postmaster-General, in direct violation of law, had omitted even to open an account with him, or to make any claim on him for five years, and yet, although it was alleged that he was solvent when discharged, and became insolvent before suit brought, these facts were held no defense to his sureties, on the ground that the laches of its officers cannot be imputed to the Government.
Several previous decisions were cited in cases of admitted neglect on the part of officers, in delaying to call to ac *295 «count delinquent financial agents of the Government to the ¡prejudice of their sureties, in all which the Government was sustained.
A still harder cáse was that of Smith vs. The United States, 5 Pet., 294, in which it appeared that after the removal of a paymaster from office no notice was given to him to account for nine years, and in the meantime he had be-come insolvent and the sureties had lost the means of indemnifying themselves. Tet they were not held discharged.
In the present case there seem to be no facts in proof showing that the delay was the fault of the officers of the United States, instead of being the natural consequence of the then condition of affairs.
Assuming that in 1869 the United States had a cause of ■•action against the defendant, the mere delay to bring suit ■cannot be alleged as laches. The statute of limitations is no defence against the United States, and their mere omission •to sue the defendant is equally unavailable as such, as the
■ Supreme Court has held in a number of cases which it is ■unnecessary to review.
But in this case the reliance is placed upon the principles ■of commercial law which, it is claimed, impose upon the •Government special duties in a case like this.
When a forged paper is accepted and paid by a bank it is ■ said that immediate notice, upon discovery of the foi’gery, must be given to the party receiving payment in order to entitle to recovery and the same rule is said to be applicable to the United States in a case like the present.
There are several classes of cases in which this question may arise. If a bank accepts and pays a check of its customer, whose name turns out to be forged, it has no remedy .against the innocent holder of the check, beeause it is bound to know its customer’s signature. And generally, when a ■drawee accepts a bill he admits the signature of the drawer ■ and cannot afterwards dispute it against a bona fide holder.
There are cases in which the mere receipt of paper without objection will be treated as acceptance, and to repel that presumption, prompt notice is necessary. And this will be *296 found to be the character of cases in which the strictest rules as to notice have been asserted. Cooke et al. vs. United States, 91 U. S., 389. And here the strictness approaches that required as to endorsers or drawers of negotiable paper.
But another class of cases is where the paper of strangers,, whose signature a banker is not bound to know, is discounted,, purchased or cashed. And to the same class belongs the-.case where a banker’s own customer’s check has the payee’s endorsement which the banker is not bound to recognize,, forged, and the banker pays to one claiming under this forged endorsement. There is a right to recover in such case, but the law does exact diligence in giving notice after the-discovery of the forgery, and one of the objects of prompt notice is recognized to be, to enable the party called upon to refund to have recoui’se against the person from whom he-received the forged instrument.
But there is no fixed rule in such a case, like that which prevails as to notice of dishonor of negotiable paper.
All that the law requires is a reasonably prompt notice-under the circumstances of each case, and undoubtedly the-situation of the parties with reference to remedies over' against antecedent parties, is a proper element to enter into-the estimate of the reasonableness of notice.
In the case of the United States vs. Union National Bank of New York, decided in the District Court for the Southei’n District of New York, by Judge Choate, and affirmed in the-Circuit Court by Judge Blatchford, it appeared that a draft by a United States paymaster on the United States Assistant Treasurer at New York, in favor of one Lewis, was received by Rutger Teal; that Lewis’ name was forged by Teal in the endorsement of the draft and finally it was taken by the defendant and paid to defendant by the assistant treasurer. The United States were notified in 1867, that the endorsement of Lewis was forged, but did not notify the defendant of it for about two years, and then, after examination, the deputy assistant treasurer conceded it was genuine... Nevertheless, in 1877, eight years alter, suit was brought *297 against the bank. Meanwhile, Polhamius & Jackson, from whom the bank had received it, became insolvent and the bank lost its recourse against them.
Under these circumstances, it seems very properly to have been held that the delay to give notice was fatal to the right of recovery.
It may be well to compare the present ease with that.
The fact of forgery was not known to the Government until January 15, 1869, when the check was submitted to' Brink in Washington. Within six days it was communicated to Lawyer, who resided in New York, and his letter was addressed to the bank notifying it of the fact and of its responsibility for a return of the money. In response to a request of the president, made by letter of the 23d, Lawyer’s affidavit was forwarded on the 27th, and on the 30th Brink’s affidavit and the forged endorsement were delivered to the bank. So that, within six days after discovery of the forgery, the bank was notified of it, and advised to seek recourse against the New York bank, and within nine days more was furnished with all the proof the Goverment could supply.
It -^as said that the United States never gave notice or made demand. But Lawyer, if he could claim payment from the bank, could only claim it as agent of the United. States, and notice from him, as such, the United States could surely avail themselves of. We think with the court below that this was virtually a notice and demand by the United States.
The notice seems reasonably prompt unless there were peculiar circumstances in the case that made it otherwise.
It is shown that the statute of limitations of New York does not bar an action such as the defendant might have brought, to recover this money from the New York bank,, for six years. It had, then, three years left within which to sue the New York bank from which it received the check, ’ and that bank is not shown to have been insolvent. So far, then, it seems clear that the delay of six days did not deprive the defendant of its recourse against antecedent parties.
*298 It is said, however, that it had lost its recourse against Riggs & Co.
Riggs & Co. are supposed to have cashed the check on January 16, 1866, and the defendant paid it on the 19th. With reference to either date the statutory period of limitation would have expired before January 21st, 1869, when the defendant received notice of the forgery. The delay, then, it is said, deprived them of recourse against Biggs & Có., an antecedent party on the paper.
But this position rests upon the, at least, doubtful, if not plainly erroneous 'assumption that the defendant ever had any recourse against Riggs & Co.
Had this been a draft on the United States, endorsed by Biggs & Co., and taken by the defendant as endorsee, and afterwards dishonored, the defendant, by the law-merchant, would have had recourse against all the antecedent parties. But the defendant was not the holder of the paper as endorsee. The defendant was the drawee of the check, and accepted, paid and cancelled it. Prior endorsers are only liable upon a note, bill or check to a holder when it is dishonored. When the note or bill is paid, the maker or acceptor who has paid it by mistake, i. e., to a wrong person, or on a forged endorsement, has no right of action on the paper itself, against any party to it. His right is to sue in assumpsit for money had and received, to recover his money, as paid under mistake of fact. And, of course, such an action can only be maintained by him against the party to whom he paid the money, leaving it to the latter, in turn, to sue his immediate predecessor in the transaction. The defendant) therefore, never could sue any other party than the New York bank from which it received the check.
This view was recognized in the case of the Bank of Commerce vs. Union Bank, 3 Comst., 230. That was an action by the drawees of a bill which had been altered and raised after it left the drawer’s hands, to recover the amount which the drawees had paid. The court said : “This action is not founded on the bill, as an instrument containing the contract •on which the suit is brought. The acceptor can never have *299 a’ecourse on the bill against the endorsers. But the plaintiff’s Tight of recovery rests on equitable grounds. In the Canal Bank vs. Bank of Albany, the principle was recognized that money paid by one party to another, through mutual mistake of facts, in respect to which both are equally bound to inquire, may be recovered back,” &c. This relation of the •drawer to the other parties is also recognized in a general way in the case cited.
It does not seem, then, that in consequence of the brief •delay in giving the defendant notice of the forgery, any recourse against other parties was lost. We are, therefore, unable to concur with the judge who tried the cáse below, that a case of laches against the United States is made out -sufficient to defeat the action.
Objection was made to the form of the exception taken •on the part of the United States, as insufficient to bring the •case properly before the court. Without examining this question in detail, we are of opinion that the exception is ■sufficiently explicit and formal to bring the merits of the •case before us.
A new trial is granted.