### In re JOSEPHSON.

#### (District Court, W. D. Georgia, S. D. May 27, 1902.)

1. BANKRUPTCY—LIENS—UNRECORDED CHATTEL MORTGAGES.

It is the settled law of Georgia that recording is not essential to the validity of a chattel mortgage, and under such rule, which will be recognized by courts of bankruptcy sitting within the state, chattel mortgages given to a bank to secure present loans, made by the bank in good faith and without knowledge of the borrower's insolvency, although unrecorded, create valid liens, and entitle the bank to preferential payment from the proceeds of the mortgaged property subsequently sold by the debtor's trustee in bankruptcy, where the withholding of the mortgages from record was not for any fraudulent purpose, nor pursuant to any agreement between the parties.

In Bankruptcy. On exceptions of trustees to findings of referee allowing claim of Exchange Bank of Macon, Ga.

F. C. Foster and C. Henry Cohen, for trustees.

A. L. Miller, for Exchange Bank of Macon.

SPEER, District Judge (orally). This is a contest between equities. The Exchange Bank, engaged in the banking business in this city, has loaned Simon Josephson sums of money at various times, and taken promissory notes and mortgages on his stock of goods therefor.

¶ 1. See Bankruptcy, vol. 6, Cent. Dig. § 276.

Claflin & Co. and other general creditors sold Simon Josephson goods. Neither the debt due on the mortgages nor the debts due for the goods have been paid. Simon Josephson has become a bankrupt, and his assets are in process of administration in bankruptcy. The fund in court is largely claimed by the Exchange Bank because of the mortgages which it holds as security. The referee has allowed this claim, and the general creditors, of whom Claflin may be considered as a type, have excepted to the decision of the referee, and brought it up for review.

Now, these mortgages of the Exchange Bank were not recorded, and that is the gravamen of the complaint of the excepting creditors. It is not contended that there was any actual agreement to withhold these mortgages from record. It cannot be contended, I think, successfully, from the record that the Exchange Bank or its responsible officers knew that Simon Josephson was insolvent at the time these mortgages were executed. It appears from the record that they were executed to secure debts for money loaned in the usual course of business of the bank, and they were all executed in consideration of a present advance from the bank to Josephson, which went into his business. It is said, however, that even in the absence of knowledge of insolvency of Josephson on the part of the officers of the bank, and in the absence of any agreement to keep these mortgages from record, and in the absence of any purpose to hinder, delay, or defraud creditors, the mortgages are nevertheless void, and that the debt which they were intended to secure must be treated as an unsecured debt, and that the Exchange Bank must stand upon the footing of the general creditors.

Now, it is conceded by both of the learned counsel for the trustees who take this position that record is not essential in Georgia to the validity of the mortgage. This has besides been repeatedly held by the supreme court, and may be regarded as settled law in this state. The supreme court of the United States in Etheridge v. Sperry, 139 U. S. 276, 277, 11 Sup. Ct. 569, 35 L. Ed. 176, declares as follows:

"While chattel mortgages are instruments of general use, each state has a right to determine for itself under what circumstances they may be executed, the extent of the rights conferred thereby, and the conditions of their validity. They are instruments for the transfer of property, and the rules concerning the transfer of property are primarily, at least, a matter of state regulation. We are aware that there is a great diversity of rulings on this question in the courts of the several states, but, whatever may be our individual views as to what the law ought to be in respect thereto, there is so much of a local nature entering into chattel mortgages that this court will accept the settled law of each state as decisive in respect to any case arising therein."

Then it follows that the settled law of the state is for the purpose of this decision the settled law to be enforced by the United States court. There can be no doubt as to the inexorable character of that rule, whatever we may think about the effect of "pocket mortgages," whether injurious or otherwise, and that is a debatable question. Unquestionably we are bound by the construction of the highest appellate court of the state as to all the circumstances relating to them,

unless the bankrupt act, by plain and unequivocal terms, has fixed a different construction upon such liens and a different rule for the determination of their priority. It is quite clear that no court of the United States would be justified in concluding that congress intended to change with radical purpose the property laws of a state unless that purpose can be gathered from explicit and unequivocal terms of the act of congress. An exceedingly ingenious and forcible argument is based upon the act of 1898, from which it is plausibly contended that congress did have the purpose of destroying the effect of an unrecorded mortgage, and of arraying the liens against the estate of the bankrupt in accordance with a definite plan of the act, and not in accordance with the settled law of the state. But that argument, strong and persuasive as it is, is not to be regarded as controlling when contrasted with the benign rule of construction above mentioned, namely, that congress will not be deemed to annul state law without explicit enactment to that effect. It would be a very singular thing for congress, in view of the scope of its duties under the constitution, to declare that a mortgage which the state law and the decisions of the supreme court held did not require record must be recorded in order to share in the distribution of the estate of a citizen of Georgia. I myself am not able to discover that purpose in the act, and I think, therefore, that we are bound by the decisions of the supreme court of the state.

My conclusion upon this controversy would have been different had there been discovered in this evidence any fraudulent purpose, or any agreement of a secret character, by which it was intended that the general creditors should be prejudiced by the execution of this mortgage; but, as I have said, no such purpose appears. It is, however, said that this rule of Georgia with relation to unrecorded mortgages enables a debtor in failing circumstances to obtain credit which is unfounded, and therefore injurious to persons giving it. This may be true in certain cases, but the remedy for this, if it be a mischief, is not with the courts. Said the supreme court in Sawyer v. Turpin, 91 U. S. 121, 23 L. Ed. 237:

"If it be said failure to put it on record enabled the debtor to maintain a credit which he ought not to have enjoyed, the answer is that the bankrupt act was not intended to prevent false credits. Its purpose is ratable distribution."

This bank lending this money parted with large sums in the due course of its business, and non constat but that this money, or a large portion of it, went directly to the discharge of debts of these creditors, or other debts of creditors now before the court. They dealt with full knowledge of the law of Georgia. They are presumed to be aware of the rule in this state with regard to the creation and registration of liens, and it would have been easily competent for Claflin & Co., by demanding a mortgage, and by recording it, to have outfaced the bank, and to have applied to their own claim the fund which is now before the court, and which the court thinks must go to the bank's claims. They took a certain commercial risk in selling these goods; the bank took certain commercial risk in lending this money. The law of the state, under the facts, favors the bank. In-

deed, if this were an open question, in accordance with the decision of the supreme court of the United States in Etheridge v. Sperry, supra, it might with much force be urged that we could not be blind to the fact that the "tendency of this commercial age is towards increased facilities in the transfer of property, and to uphold such transfers so far as they are made in good faith." It also may be said that if congress should, by sweeping enactments, declare that every lien, by means of which the commercial and agricultural people in many states of the Union obtain credit, should necessarily be placed upon record, in view of their slender means it would practically destroy their capacity to take part either in commerce or in manufacture or to carry on their agricultural operations successfully. This is true particularly of the Southern states. The legislature of each state clearly understands the necessity of its own people. The legislature has the right to determine whether it is best to have these liens recorded. In this state the legislature has failed to require their record, and the supreme court has upheld the law. That being true, in the absence of any evidence of fraudulent agreement on the part of the bank, and in the absence of any knowledge on the part of the bank that it knew of the insolvency of Josephson, and in the presence of the fact that the bank gave a full present consideration, according to the course of trade, for the debt, and secured it in the usual manner with a mortgage, we think the bank entitled to its preference, and that the judgment of the referee should be affirmed.