**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, a national banking association, Appellant,**

v.

**FEDERAL RESERVE BANK OF SAN FRANCISCO, Appellee.**

No. 19650.

United States Court of Appeals
Ninth Circuit.

Aug. 3, 1965.

Samuel B. Stewart, Robert H. Fabian, Harris B. Taylor, Geo. L. Beckwith, Los Angeles, Cal., for appellant.

John W. Douglas, Asst. Atty. Gen., Morton Hollander, Richard Salzman, Attys., Dept. of Justice, Washington, D. C., Manuel L. Real, U. S. Atty., Los Angeles, Cal., for appellee.

Before HAMLEY and JERTBERG, Circuit Judges, and JAMESON, District Judge.

HAMLEY, Circuit Judge.

Bank of America National Trust and Savings Association paid out $14,500 to one Carl Witten in cash in exchange for three checks purportedly drawn on the Treasurer of the United States. It forwarded the checks to the Treasurer for payment via the Los Angeles office of the Federal Reserve Bank of San Francisco (Reserve). Reserve initially credited Bank of America's account with the face amount of those checks. It later withdrew that credit when the Treasurer, upon his examination of those checks, refused payment on grounds of forgery. Bank of America then instituted this suit against Reserve under 48 Stat. 184 (1933), as amended, 12 U.S.C. § 632 (1958) to recover the amount lost on the checks. Following a trial without a jury the district court entered judgment for Reserve. Bank of America appeals.

Appellant advances two arguments in opposition to the judgment. The first is that, under applicable regulations, the Treasurer and Reserve have until mid-

**566**

night of the next succeeding business day after the day of receipt in which to reject checks drawn on the Treasurer. It is conceded that the Treasurer did not reject these checks within that period. The Treasurer's office received the checks on March 20 and 21, 1961. Not until March 30, 1961, did the Treasurer discover that the checks had been forged and notify Reserve by telegram that payment was refused. On March 31, 1961, Reserve notified Bank of America by telephone of the Treasurer's action.

Reserve's Circular 90 of August, 1960, at page 4 provides that United States Government checks will be handled in accordance with the provisions of Treasury Department Circular 176, 31 C.F.R. § 202.25. Circular 90 further provides that with respect to matters not covered by Circular 176, " * * * the provisions of Regulation J and this circular and time schedules shall be deemed applicable to all Government checks." Section 25(a) (4) of Circular 176, 31 C.F.R. § 202.25(e) (1) (iv), provides that in cases of checks raised or bearing a forged signature of the drawer, "not discovered upon first examination by the Treasurer," credit will be given in the Treasurer's account only when payments are made by the indorser of the checks.

Circular 176 contains no express provision as to the time within which the Treasurer must make his "first examination." Bank of America argues from this that the quoted provision of Circular 90 therefore makes it necessary to apply a time limit derived from the provisions of "Regulation J and this Circular and time schedules." Section 5(4) of Regulation J, 12 C.F.R. § 210.5(d) provides that any check which a Federal Reserve Bank presents to the drawee bank for payment or collection, and for which remittance or settlement is made by the drawee on the day which it receives such check " * * * may be returned for credit or refund at any time

prior to midnight of the drawee's next business day followng such day of receipt. * * * "

While Circular 176 contains no express provision as to the time within which the Treasurer must reject a tendered check, it does provide, in effect, that he may reject a forged check "upon first examination." The necessary implication from this provision is that the Treasurer is to have sufficient time within which to conduct the first examination. See Cooke v. United States, 91 U.S. 389, 397, 23 L.Ed. 237. Because of this implicit provision in Circular 176 for a reasonable time within which to make such an examination, the quoted provision of Circular 90 with regard to matters not covered by Circular 176 is inapplicable. Thus the "midnight of the drawee's next business day" rule may not be invoked in this case.[1]

Appellant's second argument in opposition to the judgment is that the Treasurer did not discover the forgeries "upon first examination" as required under Circular 176.

Because of the great number of Government checks, aggregating 450,000,000 in 1961 alone, the examination of Government checks in the office of the Treasurer is conducted as much as possible by electronic equipment. Each check is first imprinted with a locator number so that it can be discovered and withdrawn for a physical inspection if necessary. The information from the face of the check (account number, amount, disbursing office, etc.) is then automatically recorded on magnetic tape.

Any check issued by a disbursing office in which the amount of the check and other data is "punched" on the check continues through the electronic equipment. It is ultimately subjected to stop-payment procedures if such procedures have been invoked in advance as to such check. But checks, such as those here

1. The district court found that the Treasurer did conduct the first examination with reasonable dispatch. That finding is not under attack on this appeal.

We find it unnecessary to consider the four additional reasons advanced by appellee why appellant's one-day limit argument is without merit.

in question, issued by a small disbursing office which is not equipped to "punch" this data, are temporarily ejected before reaching the electronic stop-payment procedure.

The purpose of such ejection is to permit a visual inspection of such checks to determine whether the amount has been raised, and whether they bear a signature. Such visual inspection, however, is not designed to discover whether the signature has been forged, since data invoking stop-payment procedures as to all checks where forgeries have been reported have been fed into the electronic equipment. If visual inspection of a temporarily rejected check reveals that it has a signature and the amount has not been raised, the check is placed back into the electronic equipment where it will ultimately reach the stop-payment procedures.

On March 8, 1961, the disbursing office here in question advised the Treasurer that certain blank Treasury checks, including the ones here in issue, were missing. On the following day, the electronic data processing division placed the regular electronic stop-payment procedures into effect as to those checks. On March 20 and 21, 1961, the checks in suit reached that division of the Treasurer's office. Because of a backlog of several million other Government checks already on hand, it was not until March 27, 1961, that the checks had been reached for examination by the electronic computer, temporarily ejected for visual inspection as described above, and replaced in the electronic data processing machines for further processing. On March 30, 1961, the stop-payment intercept placed in the equipment to watch for these missing checks located and ejected them. On that same day the division determined that the signature on each such check was a forgery. Later that day the Treasurer notified Reserve by telegram that the Treasurer was for this reason refusing payment of those checks.

Appellant argues that the March 27, 1961, visual inspection made of these checks when they were temporarily ejected for such inspection, constituted the "first examination" within the meaning of Section 25(a) (4) of Circular 176, 31 C.F.R. § 202.25(e) (1) (iv). Appellants contend that since the Treasurer did not discover the forgery on that examination, but not until three days later, the Treasurer was not entitled under that regulation to reject the checks.

The district court held that the first examination constituted the entire processing of the checks from March 27 to 30.

"First examination," as used in Circular 176 includes examination for forged indorsement, forged signature of the drawer, raised amounts, and other material defects. In processing the great volume of checks which go through the Treasurer's office, for the purpose of discovering checks containing any such defects, is is reasonable and necessary to utilize electronic methods to the fullest extent possible, reserving visual inspection for discovery of defects which cannot be electronically discovered.

Rejection of forged checks could be handled electronically because stop-payment procedures could be fed into the machines. But visual inspection of checks from small disbursing offices was necessary to ascertain whether amounts had been raised and signatures were present, because small disbursing offices do not have the "punch" equipment which would have made possible electronic discovery of such defects. Acceptance of appellant's thesis would require that all defects covered by the first examination rule be discovered at the outset of the processing by either electronic or visual means, an obviously impracticable operation considering the vast number of checks being examined.

The trial court correctly concluded that the first examination constituted the entire processing of the checks from March 27 to 30.

Affirmed.