163 U.S. 385 (1896)
MEYER
v.
RICHARDS.
No. 89.
Supreme Court of United States.
Submitted October 25, 1894.
Decided May 25, 1896.
ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.
*394 Mr. E.H. Farrar, Mr. B.F. Jonas and Mr. E.B. Kruttschnitt for plaintiffs in error.
Mr. Henry L. Lazarus for defendant in error.
*395 MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.
*396 A strict construction of the pleadings would create the impression that the sale out of which the controversy arose was made upon an express oral warranty of the validity of the bonds sold. As, however, the case was submitted upon an agreed statement of facts which does not declare this to be a fact, and as both parties, as well as the court below, assumed such not to be the case, we will pretermit this aspect of the subject and consider the case upon the theory that the only warranty, if any, is one to be implied from the nature of the contract.
It is obvious from the facts just detailed that the thirteen bonds which were sold by the defendant in error to the plaintiff in error were at the time of the sale absolutely void. The twelve which originally belonged to the two college funds were in express terms declared by the constitution of the State to be "null and void," and the general assembly was forbidden to make any provision "for their payment," and they were ordered to be "destroyed in such manner as the general assembly may direct." This provision of the constitution was in existence while the bonds were in the hands of the State, and before they were fraudulently and surreptitiously sold. Indeed, these bonds were never lawfully put into circulation, because, having been originally issued to represent trust funds belonging to the State, they were held by officers of the State for its account. The remaining bond was also void under the constitution of the State, since it had been, under the express terms of that instrument, surrendered to the state treasurer for cancellation and another bond issued in its stead.
The bonds were undoubtedly sold by the defendant in error as lawful obligations of the State. Both parties to the contract of sale so considered. The pleadings and the statement of facts leave no question on this subject. The controversy here presented is wholly between the vendor and vendee as to the nature and extent of the obligation of warranty resulting from the sale. We are therefore not concerned with whether the defendant at the time of the sale stood in the attitude of a third holder of negotiable paper for value before maturity. Even if he were in such a condition, and at the time of the sale *397 there was a constitutional provision which rendered the bonds void and incapable of enforcement, it is clear that the delivery by the vendor to the vendee of bonds stricken with constitutional nullity was not the delivery of an existing obligation within the meaning of the contract if it imported a warranty of the existence of the bonds which it covered. The admission being that both parties contemplated the delivery of valid obligations, bonds of that character being outstanding, if warranty of existence was implied by law, such purpose was not fulfilled by the delivery of a mere equity, which one of the parties, the seller, claims was existing in his behalf. Valid bonds and not the mere claim by the seller to enforce invalid bonds was the object of the contract. This is especially true in view of the fact just referred to that at the date of the sale the constitution of the State in express terms forbade the enforcement of twelve of the bonds and practically stipulated to the same effect as to the other.
The sale was a Louisiana contract. We must consequently determine the rights and obligations of the parties by the law of that State. By the civil law, which prevails in Louisiana, warranty, whilst not of the essence, is yet of the nature of the contract of sale, and is, therefore, implied in every such contract unless there be an express stipulation to the contrary. Bayon v. Vavasseur, 10 Martin, 61; Strawbridge v. Warfield, 4 Louisiana, 20. The following provisions on the subject of warranty are found in the Louisiana code: "The seller is bound to two principal obligations, that of delivery and that of warranting the thing which he sells." C.C. 2475. "Although at the time of the sale no stipulations have been made respecting the warranty, the seller is obliged, of course, to warrant the buyer against the eviction suffered by him from the totality or part of the thing sold and against the charges claimed on such thing which were not declared at the time of the sale." C.C. 2501. "Even in case of stipulation of no warranty, the seller in case of eviction is liable to a restitution of the price, unless the buyer was aware, at the time of the sale, of the danger of the eviction, and purchased at his peril and risk." C.C. 2505.
*398 These articles of the Louisiana Civil Code, which do but formulate the principles of the civil law as to warranty, are not wholly in accord with the doctrines of the common law. The distinction between the two systems may be briefly summed up by saying that the one, the civil law doctrine, finds its expression in the maxim caveat venditor, whilst the rule of the common law is conveyed by the aphorism caveat emptor. It is unnecessary to determine the scope, under the Louisiana law, of the obligation of warranty as to property generally, since we are in this case concerned only with its limit when arising from the sale of a credit or other incorporeal right. The code of that State contains express provisions defining the extent of the obligations arising in such case. "He who sells a credit or an incorporeal right, warrants its existence at the time of the transfer, though no warranty be mentioned in the deed." C.C. 2646. "The seller does not warrant the solvency of the debtor unless he has agreed so to do." C.C. 2647. These provisions, instead of causing the obligation of warranty in a sale of an incorporeal right to be broader than in the case of tangible property, on the contrary make it narrower.
As then, under the law of Louisiana, the seller under the contract of sale was obliged to warrant the existence of the thing sold, the case of the defendant in error involves the practical contention that a bond which at the time of the sale was declared by the constitution of the State to be non-existing, is yet for the purposes of the sale to be treated as an existing obligation. This proposition is an obvious contradiction in terms, and of course refutes itself. In Knight v. Lanfear, 7 Rob. (La.) 172, where a treasury note had been sold without recourse, and it was found that the note had been redeemed and cancelled and thereafter had been purloined and reissued, and the word "cancelled" erased, the court held that the seller was bound to return the price.
In Pugh v. Moore, Hyams & Co., 44 La. Ann. 209, the plaintiff sought to recover the purchase price of five bonds identical in character with the bonds embraced in the sale here in controversy, four of them being Mechanical and Agricultural *399 College bonds unlawfully issued under similar circumstances to those here presented, and one being a consolidated bond unlawfully issued after its surrender in exchange for another bond. The Supreme Court of Louisiana, after elaborate consideration, held, for one among other reasons, that the seller having been obligated to the warranty of the existence of the bonds at the time of the sale, and the bonds being void under the constitution, he was obliged to return the price. This implied obligation to warrant the existence of the claim at the time of the sale has also been frequently recognized in a collateral way by the court of last resort of the State of Louisiana. Thus, where the owner of several notes, secured by one mortgage, has transferred some of the notes, and where on a sale of the mortgage property, to pay the debt, the proceeds have proven inadequate to pay all the notes, the settled doctrine in Louisiana is that in consequence of the obligation of the seller to warrant the existence of the debt, he cannot take a part of the proceeds of the mortgaged premises to pay the notes retained by him and thus frustrate the right of his transferee to take the entire amount of the security to the extent necessary to pay the notes transferred. Salzman v. Creditors, 2 Rob. 241.
The provision of the civil law of Louisiana, imposing upon the seller of a credit or incorporeal right the obligation of warranting the existence of the debt at the time of the sale is not original in the code of that State, but was drawn in so many words from the Code Napoleon, article 1693. It was not new in that code, and but expressed the settled rule of the Roman and ancient law. L.L. 4, 5, 7, 10, 11, ff. de Hæredit. vel act. vendit.; L. 68, sec. 1; L. 74, ff. de Evictionib.; L. 30, ff. de Pignor et hyp. Merlin Rep. vol. 13, Verbo Garantie des Créances.
Where the provisions of the Louisiana Code and the Code Napoleon are identical the expositions of the civil law writers and the adjudications of the French courts are persuasive as to the proper construction of the Louisiana Code. Viterbo v. Friedlander, 120 U.S. 707, 728; Groves v. Sentell, 153 U.S. 465, 478.
*400 Marcadé, in his Commentary on the Law of Sale, thus states the rule:
"All sales of a credit subject the seller, unless there be a stipulation to the contrary, to a guarantee of the existence and the validity of the credit, as also of his right of ownership to it. Article 1693 speaks, it is true, only of the guarantee of the existence of the credit. But as the credit existing to-day, if subsequently declared to have been void, would in contemplation of law have never existed, and also as it would be equally immaterial for the buyer if the credit had a real existence, if that existence was available only to some one else, it is evident that by an existing credit is to be understood one which validly exists as the property of him who transfers it. The one who transfers, then, is held to guarantee in three cases: 1. If at the time of the sale the credit did not exist, either because it had never existed or because it was extinguished by compensation, by prescription or otherwise. 2. If the credit should be declared to have been void or the obligation be rescinded. 3. If it belonged to another person than the transferrer." Marcadé, De la Vente, 335.
Troplong, in his learned treatise on the same subject, thus expounds the doctrine:
"In the sale of a credit, as in that of every other object, legal warranty is always understood. The vendor guarantees to the vendee the existence of the credit at the moment of the transfer, although there should be no expression in the contract to that effect. It is this which caused Ulpian to say: `When a credit is sold, Celsus writes in the ninth book of the Digest, that the seller is not obliged to guarantee that the debtor is solvent but only that he is really a debtor, unless there has been an express agreement between the parties on this subject.' This guarantee is more strictly obligatory in the sale of a credit than in other matters, because the right to a credit is neither visible or palpable as it is in the case of other movable or immovable property... . And here let there be no misunderstanding. Do not confound the credit with the title by which it is established. Both law and reason exact that the credit should exist at the time *401 of the sale, and it is not sufficient that a title should have been delivered to the buyer. The title is not the credit. It can materially subsist, whilst the credit is extinguished. Thus, if the credit had been annihilated by compensation or by prescription it would serve no purpose to deliver to the buyer a title which would have nothing but the appearance of life. The buyer in such case would have a right to avail himself of the warranty." 2 Troplong, De la Vente, §§ 931, 932.
And Laurent, the latest and fullest commentator, says:
"Article 1693 says `that the seller guarantees the existence of the credit.' We must understand this word `existence' in the sense given to it by tradition. `Whoever,' says Loyseau, `sells a debt or a rent, guarantees that it is due and lawfully constituted, because, without distinction in all contracts of sale, the seller is bound to three things by the very nature of the contract, (1) that the thing exists; (2) that it belongs to him; and (3) that it had not been engaged to another.' Pothier resumes this doctrine by saying `that the guarantee of a right consists in the undertaking that the right sold is really due to the vendor;' and the code is yet more brief since it speaks only of the existence of the debt. We must, therefore, see what the existence of the debt signifies according to the explanation of Loyseau. Firstly, the vendor is held to guarantee that the debt exists and subsists (`soit et subsiste'). If the debt has never existed because one of the conditions necessary for the existence of the contract makes default, the vendor has sold nothing; there is no object; he is held by the guarantee; this is obvious. The same rule would apply if the debt had existed, but was extinguished at the time of the transfer, because it is as if it had never existed. Such would be the case of a credit which was prescribed, or which had been extinguished by compensation... . It is necessary, in the second place, that the credit should be as constituted, says Loyseau; if it is stricken with a vice which renders it void, the vendee has a right to the warranty. This is not doubtful, since the right is really annulled or rescinded, because the judgment which has annulled *402 the credit destroys it as if it had never existed." Laurent, vol. 24, Nos. 540-41-42.
The views thus expressed by the foregoing writers are substantially concurred in by the French commentators. Duranton, vol. 9, p. 183; Aubrey & Rau, vol. 5, p. 442. The courts of France from an early day have applied the same principle.
In Prat c. Dervieux the facts were these: Dervieux transferred the amount of a claim against the government, which by a subsequent liquidation of accounts was compensated by a claim held by the government which resulted from another matter. The Court of Cassation held that under article 1693 of C.N. the obligation to guarantee the existence of the claim at the time of the sale compelled the seller to restore the price. Journal du Palais, 1807, p. 311.
In Revel c. Lippman a transfer was made of a claim against the government, which was stated to be subject to a future settlement of accounts. On the ultimate liquidation it was found that nothing was due, and the Court of Cassation held that the obligation, therefore, arose to return the price paid on the sale. Journal du Palais, 1825, p. 963.
Of course, this warranty of existence, as established by the law of Louisiana and as found in France and other civil law countries, does not govern a contract of sale when the object contemplated by a sale is a thing whether existing or not existing; in other words, where the parties buy, not an existing obligation, but the chance of there being one. This is illustrated by Knight v. Lanfear, supra, where the court, per Martin, J., said, in speaking of the thing sold: "Whatever may be its value, if it be not in substance what the purchaser believed he was receiving, his error must invalidate the sale, because it prevented his consent; non videtur, qui errat, consentire."
And, in speaking of a sale of doubtful or non-existing things, this great judge said: "This claim was a fair object of sale if its nature had been disclosed, but that was concealed and was probably unknown to them, and what was offered for sale was something quite different from this claim."
*403 The same distinction has been considered and applied by the courts of France. Dulac c. Clusel et Cie., Lyons, Nov. 30, 1849, Journal du Palais, 1, 1852, 32.
The defendant in error does not dispute that the foregoing principles exist in and are controlling under the Louisiana law, under the law of France, and also under the civil law generally from which the law of Louisiana is derived. But whilst thus admitting, he denies that the contract of sale, involved in this case, was governed either by the Louisiana code or the general principles of the civil law. This proposition rests on the contention that when the Civil Code of Louisiana was compiled, its framers contemplated the simultaneous enactment of a Commercial Code which was then drafted, and therefore omitted from the former code the necessary provisions to govern commercial contracts under the hypothesis that the latter would also be enacted; that in consequence of the failure to adopt the Commercial Code, the courts of Louisiana have held that cases arising under the law merchant are governed by that law in the absence of an express statutory requirement to the contrary. From this premise the conclusion is drawn that as the contract in question involved the sale of negotiable bonds, the obligations resulting from the sale are commercial in their nature, and are controlled by the law merchant, by which it is asserted the vendor in such a case, when selling in good faith, warrants only that the signatures to the paper sold are not forgeries. In a restricted sense the part of the proposition relating to the operation of the law merchant, in the State of Louisiana, is well founded. Harrod v. Lafayre, 12 Martin, 29; Wagner v. Kenner, 2 Rob. La. 122; Barry v. Insurance Co., 12 Martin, 498; McDonald v. Milloudon, 5 Louisiana, 403. Whilst this is true, the contention is yet erroneous in a twofold sense; first, in presupposing that a mere contract of sale of commercial paper, without recourse, is governed as to the obligations, between the vendor and vendee, by the law merchant; second, in assuming that in such a sale, either under the principles of the civil law or what the argument presumes to be the law merchant, the only warranty resting *404 upon the vendor is that of the genuineness of the signatures to the paper sold.
In Pugh v. Moore, Hyams & Co., supra, the Supreme Court of Louisiana expressly held that the contract of sale there considered (which was similar to the one here involved) was governed and controlled by the provisions of the Civil Code of Louisiana, and like rulings were previously expressed in Sun Mutual Insurance Co. v. Board of Liquidation, 31 La. Ann. 176, and in State ex rel. Durant v. Board, 29 La. Ann. 77. A like rule is maintained in the jurisprudence of France, where, in addition to the Code Napoleon or Civil Code, there is a Commercial Code regulating mercantile contracts. This is shown by the decision in a case where the vendor transferred certain notes without recourse, and in consequence of the forgery of some of them was held liable to return the price. Laurent, vol. 24, p. 535 thus states the case:
"The Court of Cassation has applied the same principle to commercial matters. The case is worthy of citation. Exchange dealers sold a certain number of notes of the Austrian bank of one hundred florins each. These notes having been presented to the bank of Vienna, by the transferees, twenty-six among them were declared to be forged. From this arose an action in warranty, which was defeated in the first instance by the tribunal of the Seine. The claim was recognized on appeal. When the case came before the Court of Cassation it was contended that the Paris court had made an erroneous application of article 1693, in declaring an exchange dealer, a guarantor of the value of false bank notes which he had delivered in good faith, to a particular person by way of sale or transfer. The guarantee, it was said, by those who transferred a forged bank note, is not different in fact from that which is incurred by a merchant, an exchange broker or banker, who has without intention and without knowledge negotiated in good faith commercial effects, such as bills of exchange or notes to order upon which there are false signatures, the guarantee in such cases is regulated by the commercial law. And it results from articles 140 and 187 of the Commercial Code that he who has not endorsed but *405 who has delivered from hand to hand, as he has received them, commercial paper is subject to no guarantee, because the absence of his signature indicates that he has no intention to become the guarantor of the sale, and that the buyer has dealt on the faith of the apparent title which he has accepted, and as a consequence he has a right to no guarantee. But the Court of Cassation rejected this contention, and decided that the guarantee is of the nature of the sale, and that it would be contrary to both law and equity to hold that the delivery of a forged bank bill, although made in good faith, did not give rise to recovery on the part of him who had paid the price."
None of the authorities referred to by counsel for defendant in error sustain the proposition heretofore stated with reference to the supposed existence and applicability of the law merchant, and the results which it is claimed flow therefrom. On the contrary, both in England and in the United States the doctrine is universally recognized that where commercial paper is sold without indorsement or without express assumption of liability on the paper itself, the contract of sale and the obligations which arise from it, as between vendor and vendee, are governed by the common law, relating to the sale of goods and chattels. So, also, the undoubted rule is that in such a sale the obligation of the vendor is not restricted to the mere question of forgery vel non, but depends upon whether he has delivered that which he contracted to sell, this rule being designated, in England, as a condition of the principal contract, as to the essence and substance of the thing agreed to be sold, and in this country being generally termed an implied warranty of identity of the thing sold.
Benjamin on Sales, (4th Am. ed.) sec. 600, says: "When the vendor sells an article by a particular description, it is a condition precedent to his right of action" (to recover the price agreed to be paid by the vendee) "that the thing which he offers to deliver, or has delivered, should answer the description;" and, in sec. 607, the author says:
"Under this head may also properly be included the class of cases in which it has been held that the vendor who sells *406 bills of exchange, notes, shares, certificates and other securities, is bound, not by the collateral contract of warranty, but by the principal contract itself, to deliver as a condition precedent that which is genuine, not that which is false, counterfeit or not marketable by the name or denomination used in describing it."
It is upon this general principle of the common law, not upon any peculiar doctrine of commercial law, that the cases in the common law courts proceed. Thus, in Jones v. Ryde, 5 Taunt. 488, (1814,) where an action was brought to recover the damage sustained by a discount of an altered bill, Gibbs, C.J., said (p. 492):
"Both parties were mistaken in the view they had of this navy bill; the one in representing it to be a navy bill of this description; the other in taking it to be such. Upon its afterwards turning out that this bill was to a certain extent a forgery, we think he who took the money ought to refund it to the extent to which the bill is invalid. The ground of the defendant's resistance is, that the bill is not endorsed; and that whensoever instruments are transferred without indorsement, the negotiator professes not to be answerable for their validity. This question was much mooted in Fenn v. Harrison, 3 T.R. 757, and it is true to a certain extent, viz., that in the case of a bill, note or other instrument of the like nature, which passes by indorsement, if he who negotiates it does not endorse it, he does not subject himself to that responsibility which the indorsement would bring on him, viz., to an action to be brought against him as endorser, but his declining to endorse the bill does not rid him of that responsibility which attaches on him for putting off an instrument as of a certain description which turns out not to be such as he represents it. The defendant has in the present case put off this instrument as a navy bill of a certain description; it turns out not to be a navy bill of that amount, and, therefore, the money must be recovered back."
Chambre, J., said (p. 494):
"I really cannot entertain a doubt on the question; if the defendant's doctrine could prevail it would very materially *407 impair the credit of these instruments. They are not in practice endorsed, (or not beyond the first taker). A man takes this security looking to the persons who are to pay it; he takes it on the presumption that it is a navy bill; it was once a navy bill, but from the moment wherein it was altered it became of no value whatsoever. It is unnecessary to go into the authorities."
In Wilkinson v. Johnson, 3 B. & C. 428, (1824,) one who had taken up a bill for honor, subsequently discovered that the signatures were forgeries. He was held entitled to recover, upon the general doctrine of the common law relating to contracts.
In Young v. Cole, 3 Bing. N.C. 724, (1827,) recovery was sought for the amount of certain Guatemala bonds which had been sold for account of the defendant, and which after the sale were discovered not to be a marketable commodity on the stock exchange, because not stamped, as required by an advertised notice of the government of Guatemala, given prior to the sale, but subsequent to the time when the bonds had been issued and put into circulation. The claim of the plaintiff was adjudged to be well founded, although there was no question of forgery or alteration, upon the common law principle already stated.
Lamert v. Heath, 15 M. & W. 486, (1846,) was an action to recover from the defendant the amount paid him for certain Kentish Coast Railway scrip, which, after delivery to the plaintiff, turned out to have been issued without authority. The defendant was a stock broker, and was employed by the plaintiff to purchase the scrip. A verdict having been returned for the plaintiff a new trial was granted, on the ground that as the proof showed that the article purchased was the only article known in the market as Kentish Coast Railway scrip, the question for the jury was not whether the scrip was genuine scrip, but whether it was the identical thing which the plaintiff contracted to buy. This ruling, therefore, accords with the principles of the former cases and illustrates the distinction between an implied condition of the sale as the essence of the thing sold and the ascertainment of whether the contract *408 of sale in the purview of the parties embraced a particular object, just as it appeared to be whether existing or not, whether valid or invalid. In this respect this case is entirely in harmony with the opinion of Martin, J., heretofore referred to. It, moreover, very pointedly refutes the contention that a particular state of the law of warranty applies to the transaction of a sale and purchase of negotiable paper without recourse, since the scrip in question was non-negotiable.
In Gompertz v. Bartlett, 2 El. & Bl. 849, (1853,) an unstamped bill of exchange endorsed in blank, purporting to be a foreign bill, was sold, without recourse, by the holder, who was not a party to the bill. It proved to have been drawn in England, and was, in consequence, invalid for want of a stamp, and could not be enforced against the parties. The vendor and purchaser at the time of sale were both alike ignorant of this defect. It was held that the purchaser was entitled to recover back the price from the vendor, on the ground that the article sold as a foreign bill, although not forged or altered, did not answer the description by which it was sold. Counsel for defendant contended that "as the bill was sold without recourse, nothing turned on the peculiar character of a bill of exchange, and the case was the same as if the sale had been of any other specific chattel, sold without a warranty, when the maxim caveat emptor applies." Lord Campbell, C.J., replied (p. 850):
"If the purchaser receives what answers the description of the article sold, he cannot, in the absence of a warranty, recover for a defect in its quality. In such case, caveat emptor. But it will be put against you here, that you sold a foreign bill, and that the thing delivered was not a foreign bill at all."
The counsel for plaintiff stated his case in the following words, which, in view of the language previously quoted from the defendant's counsel, makes clear the fact that it was not disputed that the transaction was governed by the common law applicable to sales:
"The plaintiff's proposition is, that if a thing was sold as being an article of a specific description, and if, from a latent defect unknown to both parties, it was in substance not an article of that specific description, but an article of no value, *409 the purchaser is entitled to recover back the price he has paid for it, not on the ground of a breach of warranty, but because he has paid for the thing sold, and what he has received is not the thing sold, but of a different kind."
In Gurney v. Womersley, 4 El. & Bl. 133, (1854,) an action was brought by a firm of bill brokers to recover the amount paid on the discount of a bill transferred by mere delivery, where the signatures, with one exception, were forgeries. It was held that, though there was no indorsement or guaranty, and, therefore, no warranty, of the solvency of the parties to the bill, there was a total failure of consideration, and plaintiffs were entitled to recover back the money paid for the bill from the party with whom the transaction was had. Coleridge, J., observed (p. 141):
"The vendor of a specific chattel, it is not disputed, is responsible if the article be not a genuine article of that kind of which the seller represents it to be. And the question raised really is, what is the extent of the want of genuineness for which he is responsible? Without laying down the limits, it is clear to me that this case fell much within them. In effect here the defendants said to the plaintiffs, will you take, without recourse to us, this bill which purports to bear the acceptance of P. & C. Van Notten? By doing so they represented it to be their acceptance, as it purported to be, and sold it, as answering that description."
Wightman, J., said (p. 142):
"In considering whether a defect in an article renders it not an article of the kind of which it was represented to be on the sale, or is merely a breach of a collateral warranty, much must depend upon the special circumstances and terms of the rule. Here I think that the bill, not being an acceptance of P. & C. Van Notten, fails in what was the substance of the description by which it was held."
Lord Campbell, C.J., said (p. 143):
"I am of opinion that though the defendants, by not endorsing or guaranteeing the bill, preserved themselves from warranting the solvency of any of the parties, yet they did undertake that the instrument was what it purported to be. *410 It is not disputed that in fact the discount of their bill by the plaintiffs was solely on the faith of its being an acceptance of P. & C. Van Notten, which it was not; and in consequence of its being so it was valueless. The possibility of recourse against the estate of Anderson, a convict and a bankrupt, did not prevent there being a total failure of consideration."
The cases in the American courts, whilst declaring the same rule as that recognized in England, place it upon a theoretical basis differing somewhat from that announced by the English courts; that is, instead of pronouncing it a condition of the principal contract that the thing sold, in its essence and substance, must be delivered, declare that there is an implied warranty of identity, or, in other words, that the thing sold is what it purports to be. Daniels, in his treatise on Negotiable Paper, § 733a, calls attention to the different definitions given to the same obligation by the American and English courts, and indicates the view that the form of expression used by Benjamin in the passage already quoted is the more accurate one.
Aside, however, from the mere garb in which the thought is clothed, the American and English courts are in full accord. This is shown by the case of Utley v. Donaldson, 94 U.S. 29, 45, where Benjamin on Sales is approvingly referred to, as also Flynn v. Allen, 57 Penn. St. 482, and Webb v. Odell, 49 N.Y. 583, both of which cases, as also the line of American adjudications which enforce the same doctrine, are noted in the margin of this opinion.[1]
*411 Many of the controversies covered by the cases referred to arose in consequence of the sale of a forged note, but the principles upon which all the authorities proceed do not confine the right of recovery to such a case, but rest upon the general doctrine to which we have already referred. In fact, no case is reported wherein the obligation, as between vendor and vendee, in the sale of negotiable paper, is claimed to be controlled other than by the general principles of the common law, though in three cases, Baxter v. Duren, 29 Maine, 434, Fisher v. Rieman, 12 Maryland, 497, and Ellis v. Wild, 6 Mass. 321, the deduction was made from the law respecting the sale of goods that on a sale of negotiable paper there was under the principle of caveat emptor no implied warranty even that the signatures to the paper were not forged. Ellis v. Wild was, however, expressly overruled in Merriam v. Wolcott, 3 Allen, 258, 260; and from the allusions to Baxter v. Duren, contained in the later Maine decisions previously noted in the margin, it is doubtful whether the early ruling in Maine would now be followed there. The three cases referred to, it is needless to say, are practically disregarded by the entire current of American and English authority, and stand alone. They are disavowed by the defendant in error here, since his argument admits that there is a warranty of the genuineness of the signatures, to an apparent negotiable instrument, thereby conceding the subsistence of the obligation to warrant the existence or identity of the thing sold, and yet seeking to avoid its consequences by limiting it to non-existence resulting from a particular nullity. There is an exceptional case, Littauer v. Goldman, 72 N.Y. 506, (1878,) which holds that the common law obligation, as to the implied warranty of identity in the thing sold, in the case of commercial paper, extends only to the genuineness of the instrument. The case was one involving the nullity of a usurious note, and, if correctly decided, would be authority for the proposition that there was a peculiar species of warranty in the sale of commercial paper, *412 differing from all others; in other words, that there was a law merchant of warranty where there was no commercial contract. The opinion in this case illustrates the same contradictory position presented here by the argument of the defendant in error, to which we have just called attention, that is, that it admits the common law rule and then denies its essential result by eliminating conditions of non-existence which are necessarily embraced by it. It follows that this New York decision leads logically to the view expressed in the Maine and Maryland cases just referred to, for either the principle of warranty of identity must be accepted or rejected; it cannot be accepted and its legitimate and inevitable results be denied. The rule there announced was in conflict with previous decisions in New York, and the decision is strongly criticised by the Court of Errors and Appeals of New Jersey in Wood v. Sheldon, 42 N.J. Law, 421, 425.
In Giffert v. West, 33 Wisconsin, 617, (1873,) where a note was sold which was void for usury, the vendee was allowed to recover the consideration paid by him, and his right to do so was based upon the general doctrine that one making a sale is bound as a condition of the principal contract to an implied warranty of the existence of the thing sold.
In Hannum v. Richardson, 48 Vermont, 508, (1875,) a very clear statement of the doctrine is found. There an indorser sold a negotiable promissory note without recourse. The note had been given for intoxicating liquors sold in Vermont in violation of law, and on that account was void at its inception. It was claimed that the defendant knew of the invalidity of the note when he transferred it. The court, however, held that knowledge on the part of the seller was not necessary to fix his liability, saying (p. 510):
"By indorsing the note `without recourse,' the defendant refused to assume the responsibility and liability which the law attaches to an unqualified indorsement, so that, in respect to such liability, it may perhaps be regarded as standing without an indorsement. If it be so regarded, then in what position do these parties stand in respect to the transaction? The principle is well settled, that where personal property of any *413 kind is sold, there is on the part of the seller an implied warranty that he has title to the property, and that it is what it purports to be, and is that for which it was sold, as understood by the parties at the time, and in such case knowledge on the part of the seller is not necessary to his liability."
On p. 511 the court further observed:
"The note in question was not a note, it was not what it purported to be, or what it was sold and purchased for; it is of no more effect than if it had been a blank piece of paper for which the plaintiff had paid his fifty dollars. In this view of the case we think the defendant is liable upon a warranty that the thing sold was a valid note of hand."
Nor is there any foundation for the assertion that Otis v. Cullum, 92 U.S. 447, and the cases of Orleans v. Platt, 99 U.S. 676, and Ætna Life Ins. Co. v. Middleport, 124 U.S. 534, both of which cite Otis v. Cullum, support the doctrine that a sale of commercial paper without recourse is not, as between the vendor and vendee, governed by the ordinary rule of the common law. On the contrary, that case expressly rested its conclusion on the decision in Lamert v. Heath, supra, which latter case, as we have seen, whilst enforcing the principles of the common law, considered that under the particular facts there presented it was a question for the jury to determine whether the scrip delivered was the kind of scrip which the defendant had ordered purchased. That case not only, as has already been stated, concerned non-negotiable paper, but its decision involved no question of the scope of the warranty, but solely what was the thing bought. Nor does the case of Otis v. Cullum justify the assumption that this court laid down the rule that a mere sale of commercial paper, as between vendor and vendee, when the sale was made without recourse, created some peculiar and exceptional warranty to be considered in this particular as the law merchant. It is true that in expressing the general doctrine, Mr. Justice Swayne said: "The seller is liable ex delicto for bad faith, and ex contractu there is an implied warranty on his part that they belong to him and are not forgeries. Where there is no express stipulation there is no liability beyond this." But in *414 using this language, as to the extent of the warranty, the mind was directed to that form of non-existence which more commonly obtains, and the expression is a mere illustration of the rule de eo quod plerumque fit. If this were a case where a vendee claimed to recover back the price paid by him on a purchase of negotiable securities, which pass by delivery from hand to hand, on the averment that after the sale it had developed that they were not valid (although not forgeries), because the law under which they had been issued was constitutionally void or ultra vires, the claim of implied warranty of existence would be without merit, for the reason that such a state of fact would present a case of a sale of securities whether valid or invalid, hence engendering no implication of warranty of existence. Under the state of facts thus supposed, the purpose of the parties to make a contract of that nature would legally result from the fact that they were both necessarily equally chargeable with notice of want of power, and therefore would be both presumed to have acted with reference to such knowledge. This is Otis v. Cullum. But it is not the case at bar, since it is here admitted that both parties, in entering into the contract of sale, contemplated valid securities, of which there were many outstanding, and those delivered were void, not because of a want of power to enact the law under which they were issued, or because they were ultra vires for some other legal cause, but because they were stricken with nullity by a constitutional provision adopted after the act authorizing the issue of the securities, and where nothing on the face of the bonds indicated that they were illegal. The distinction pointed out by the foregoing statement not only illustrates the correctness of the decision in Otis v. Cullum, but also demonstrates the error of attempting to extend it to the state of facts presented in the case under consideration. Indeed, in examining and applying Otis v. Cullum the fact that it does not control a case like this has been recognized. Daniel, Neg. Inst. § 734a; Rogers v. Walsh, supra; Cincinnati, New Orleans &c. Railway v. Citizens' National Bank, 24 Week. Law Bull., (Ohio) 198, 211.
The foregoing analysis of the principles and review of the *415 authorities governing the law of sale of negotiable paper, transferred without recourse, as between vendor and vendee, clearly demonstrates the unsoundness of the positions upon which the defendant in error relies, since it affirmatively establishes that there is no peculiar warranty, in a sale of commercial paper, and that the reasoning by which it is attempted to prove its existence is a mere misconception of the principles of the common law relating to the sale of goods and chattels.
In passing, however, it is worthy of note that whilst the civil law enforces in the contract of sale generally the broadest obligation of warranty, it has so narrowed it, when dealing with credits and incorporeal rights, as to confine it to the title of the seller and to the existence of the credit sold, and, e converso, the common law, which restricts warranty within a narrow compass, virtually imposes the same duty by broadening the warranty as regards personal property so as to impose the obligation on the vendor to deliver the thing sold as a condition of the principal contract or by implication of warranty as to the identity of the thing sold. By these processes of reasoning the two great systems, whilst apparently divergent in principle practically work substantially to the same salutary conclusions.
There are many questions discussed in the brief of counsel which we do not notice, and which we content ourselves with saying are without merit. The views above stated are controlling and decisive of the case and lead necessarily to the reversal of the judgment. As the case was heard upon a stipulation waiving a jury and upon an agreed statement of facts, it is our duty, in reversing, to direct that the proper judgment be entered below. Fort Scott v. Hickman, 112 U.S. 150, and cases there cited.
It follows that
The judgment of the Circuit Court must be reversed, and the case be remanded with directions to enter judgment for plaintiffs for eight thousand three hundred and eighty-three dollars and seventy-five cents ($8383.75) with interest from judicial demand and costs.
NOTES
[1] Thrall v. Newell, 19 Vt. 202, 206, (1847); Lyons v. Miller, 6 Grat. 427, 439, (1849); Aldrich v. Jackson, 5 R.I. 218, (1858); Barton v. Trent, 3 Head, 167, 169, (1859); Delaware Bank v. Jarvis, 20 N.Y. 226, 229, (1859); Merriam v. Wolcott, 3 Allen, 258, (1861); Bell v. Cafferty, 21 Ind. 411, 413, (1863); Swanzey v. Parker, 50 Penn. St. 441, 450, (1865); Morrison v. Lovell, 4 W. Va. 346, 350; Webb v. Odell, 49 N.Y. 583, (1872); Worthington v. Cowles, 112 Mass. 30, (1873); Snyder v. Reno, 38 Iowa, 329, 333, (1874); Giffert v. West, 33 Wis. 617, (1873); 37 Wis. 115, 117, (1875); Hannum v. Richardson, 48 Vt. 508, (1875); Hussey v. Sibley, 66 Maine, 192, (1876); Hurst v. Chambers, 12 Bush. (Ky.) 155, 158, (1876); Allen v. Clark, 49 Vt. 390, (1877); Bankhead v. Owen, 60 Ala. 457, 461, (1877); Smith v. McNair, 19 Kan. 330, (1877); Challiss v. McCrum, 22 Kan. 157, 161, (1879); Rogers v. Walsh, 12 Neb. 28, (1881); Milliken v. Chapman, 75 Maine, 306, 317, (1883); Daskam v. Ullman, 74 Wis. 474, 476, (1889); Palmer v. Courtney, 32 Neb. 773, (1891); Ware v. McCormack, (Ky.) 28 S.W. 157, (1894); Brown v. Ames, (Minn.) 61 N.W. 448, (1894).