NATIONAL EXCHANGE BANK OF PROVIDENCE v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. January 2, 1907.)

No. 617.

1. BILLS AND NOTES—PAYMENT ON FORGED INDORSEMENT—RECOVERY OF PAYMENT.

The ordinary rule is that, to entitle one who through mistake has paid out money on a forged indorsement of a check or other commercial paper to recover the same back, notice of the forgery must be given to the party receiving such payment within a reasonable time after its discovery.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 7, Bills and Notes, §§ 1272, 1273.]

2. UNITED STATES—ACTION TO RECOVER MONEY PAID BY MISTAKE—LACHES.

Pension checks, or warrants, issued by a pension agent of the United States on an Assistant Treasurer, are commercial paper, and the right of the United States to recover from one to whom such a check was paid on a forged indorsement of the name of the payee is governed by the ordinary rules applicable to such paper.

Aldrich, District Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Massachusetts.

Charles K. Cobb and Theodore F. Green, for plaintiff in error.
William H. Garland, Asst. U. S. Atty.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This is an action at law, brought in the Circuit Court by the United States against the National Exchange Bank of Providence, in which a jury was waived in accordance with the statute, and the case was tried by the presiding judge on an agreed statement. The judgment was for the United States, and the defendant below sued out this writ of error. The principal facts are correctly stated in the opinion of the learned judge of the Circuit Court as follows:

"This was a suit at law to recover back money paid by the plaintiffs to the defendant upon pension checks bearing forged indorsements. By the agreed statement of facts it appears that the checks were issued quarterly by the United States Pension Agent, at Boston, between 1884 and 1897. Some of the persons to whose order the checks were drawn were then dead. Others were remarried widows, not entitled to a pension. On June 18, 1897, the special examiner of the Pension Bureau reported to the Bureau that the indorsements of some of the checks in suit were probably forged by Munson. On December

18, 1897, notice of these forgeries was given to the defendant by the United States Attorney, at Providence, and the defendant was informed that at a proper time reclamation would be made upon it. At various dates between February 19 and May 28, 1898, the indorsements upon the other checks were discovered to be forgeries. On July 22d, the United States Attorney made demand upon the defendants. The writ was dated August 27, 1901."

The precise form of only one of the so-called checks is shown by the record, as follows:

United States Pension Agency,                    No. 297073
    Boston, Mass., Mch 5 1892
Assistant Treasurer of the United States
    Boston, Mass.
Pay to the order of Mahala B. Jaques                        9492 B81
    Thirty-six            100 Dollars.          $36
    36                                          Interior
                                          W. H. OSBORNE,
                                                  *U. S. Pension Agent.*

Paid Mar. 12, 1892
            Asst. Treas., *Boston.*
Indorsements:
                                          MAHALA B. JAQUES,
                                                  , *Payee.*
                          M. M. ANGELL.

Pay Nat. Bank of the Republic, Boston or order, for collection, for account of First National Bank, Providence, R. I.
                          C. E. LAPHAM,
                                  *Cashier.*
    Indorsement Guaranteed.
            Nat'l Bank of the Republic, Boston.

This is, however, understood to be a sample of the remaining checks. As they were drawn by the pension agent on the Assistant Treasurer of the United States, the question naturally arises whether, after all, they were anything more than official warrants, a question which we will turn to later. It will be observed, however, that no indorsement by the Exchange Bank appears on the sample shown in the record, and whatever indorsement there is, is simply "for collection."

The only question before us was also correctly put by the learned judge of the Circuit Court, as follows:

"This, therefore, is the question presented for decision: If A. by honest mistake pays money to B. upon a check bearing a forged indorsement, and then A. unnecessarily and unreasonably delays to notify B. of the discovery of the forgery, can he recover back the money paid from B. in the absence of evidence that the delay has worked damage to B.?"

The learned judge said:

"Upon the whole, the authorities answer this question in the affirmative."

He added as follows:

"Negligence without resulting damage does not create an estoppel. In the case at bar, damage was alleged, but the agreed facts contain no evidence to support the allegation."

It is to be noted that this case does not involve the rule which arises out of payments by a bank of checks drawn upon itself, bearing an apparent, but forged, signature of one of its customers. It relates

only to the demand for the repayment of money paid on account of forged or false indorsements of signatures of individuals whose signatures the United States were not bound to know, as a bank is bound to know those of its customers. It is also to be noted that there is no suggestion made before us that either the bank in question here or the United States have been guilty of negligence, except in the particular to which our attention has been brought, namely, an unreasonable delay on the part of the United States in giving notice of the discovery of the false signatures or forgeries.

Mr. Justice Story, in 1825, in his opinion in United States Bank v. Bank of Georgia, 10 Wheat. 333, closing at pages 343 and 344, 6 L. Ed. 334, a discussion of the relations between a bank and an individual from whom the bank may have received forged circulating bills, apparently its own, and other bills or notes bearing forged signatures, and explaining that, under some circumstances, there is nothing unconscientious in retaining the sums received from the bank "which its acts have deliberately assumed to be genuine," ends as follows:

"If this doctrine be applicable to ordinary cases, it must apply with greater strength to cases where the forgery has not been detected until after a considerable lapse of time. The holder, under such circumstances, may not be able to ascertain from whom he received them, or the situation of the other parties may be essentially changed. Proof of actual damage may not always be within his reach; and therefore, to confine the remedy to cases of that sort, would fall far short of the actual grievance. The law will, therefore, presume a damage, actual or potential, sufficient to repel any claim against the holder. Even in relation to forged bills of third persons, received in payment of a debt, there has been a qualification ingrafted on the general doctrine that the notice and return must be within a reasonable time; and any neglect will absolve the payer from responsibility."

The concluding rule thus stated by Mr. Justice Story with regard to commercial bills became thoroughly settled as a principle of law in the United States; it being distinguished from the severer rule which existed in England. It reaches all classes of commercial paper, and never has been questioned by any authority in a positive way. In Bank of Commerce v. Union Bank, 3 N. Y. 230, 237, decided in 1850, the opinion rendered in behalf of the court by Judge Ruggles, relating to the precise question we have here, closes as follows:

"In cases where no negligence is imputable to the drawee in failing to detect the forgery, the want of notice within a reasonable time is excused, provided notice of the forgery is given as soon as it is discovered."

United States v. Central Bank (D. C.) 6 Fed. 134, 135, decided in 1881, was supported by the concurring opinions of Judge Butler, district judge for the Eastern district of Pennsylvania, Judge Cadwalader, also a district judge of the same district, and Judge McKennan, a circuit judge, all of them of acknowledged experience and ability. The case involved some very peculiar facts, so that the ruling was broader than anything that we are considering here. Nevertheless, the opinion referred to Cooke v. United States, 91 U. S. 389, 23 L. Ed. 237, in such a way as to adopt the recognition of the peculiar rules relative to commercial paper stated at pages 396 and 397 of 91 U. S. 23 L. Ed. 237; and, what is important here, it made no exception growing out of any question whether damage ensued from

any delay in giving notice of the forgeries. There was an opinion in the same volume by District Judge Choate, of the Southern district of New York, in United States v. National Park Bank (D. C.) 6 Fed. 852, 854, which sustains the position of the United States taken before us; but it was rested on decisions none of which seem in point. Certainly, in almost every case cited by him, if not in every one, the court, or the reporter, was particular to state that notice was given immediately on the discovery of the forgery. Many related to the ordinary rule about money paid under mistake, while the rule with reference to money paid out on commercial paper, like all other rules concerning recourse to parties indorsing such paper, has long been regarded in both the United States and England as peculiar, although, to a certain extent, dealt with, as we have said, more sharply in England than with us.

In United States v. Clinton Bank (D. C.) 28 Fed. 357, decided in 1886 by Mr. Justice Brewer, then a circuit judge, with regard to the rule which we maintain, the learned judge said that it seemed "to be sustained by the common voice of the authorities." Also, we refer to the notes made by Mr. Justice Holmes to Kent's Commentaries (12th Ed. 1873) vol. 3, *85, where it is stated that recovery may be had by the holder, "provided he has given notice of the forgery as soon as discovered." The same note makes comparison with the more precise rule in England. Note b to page *86, which we understand to be the personal note of Chancellor Kent, recognizes, with reference to negotiable paper, the same condition, namely, that "there be no unreasonable delay after the discovery of the forgery." This is stated unqualifiedly. So the note of the distinguished author J. C. Perkins to Chitty on Contracts (11th Am. Ed.; 1874) vol. 2, 931, says as follows:

"But the one who has received such counterfeit bills or notes in payment of his debt must return, or offer to return, them in a reasonable time, or he will forfeit his rights to recover the amount of them from the payer."

It is true that, in some of the decisions, the observations pertinent to this case were not strictly necessary, and were in a sense dicta. Nevertheless, what we have cited were the unqualified expressions of learned and experienced judges and authors who were not using them theoretically, but historically. None of them made any exception of the kind claimed by the United States in the case at bar, namely, that the defending bank, in order to meet the demand of the United States, is bound to establish that it suffered detriment by the delay. ·

On the other hand, none of the authorities cited in behalf of the United States sustains them. Daniel on Negotiable Instruments (5th Ed.) §§ 1371, 1372, on which they especially rely, confirms the rule as claimed by us. At section 1371 the author says:

"It is undoubtedly necessary that the maker, acceptor, or other party, who demands restitution of money, paid under a forged indorsement, or under a forged signature of the drawer of a bill, should make the demand without unreasonable delay."

This is the rule. At section 1372 Mr. Daniel merely adds, "But there is high authority for the more liberal, and, I think, more just

and wiser doctrine"; that is, the same as that claimed by the United States. This, so far from denying the established rule, admits it, and it only takes cognizance of some supposed expressions the other way. We have examined all of Mr. Daniel's citations in support of this suggestion, and they fail therein. The first one is Parsons on Bills & Notes, vol. 2, 598. This is probably the edition of 1879, where nothing is stated positively. The learned author there uses the word "perhaps." Another reference is to Welch v. Goodwin, 123 Mass. 71, 78, 25 Am. Rep. 24. In that case it is stated at page 71 of 123 Mass. (25 Am. Rep. 24) that notice was immediately given, and the opinion of the court, at page 78 of 123 Mass. (25 Am. Rep. 24) expressly lays aside the question we have before us. In two of the New York cases referred to, it was stated by the reporter that notice of the forgery after it was discovered was immediate. In Third National Bank v. Allen, 59 Mo. 310, and in Iron City Bank v. Fort Pitt Bank, 159 Pa. 46, 28 Atl. 195, 23 L. R. A. 615, the question before us was in no way passed on, nor was it in issue; and the other cases were ordinary suits for the recovery of money paid under mistake of fact. Among the cases not cited by Mr. Daniel, but cited to us at bar, are United States v. National Bank of the Republic, 2 Mackey (D. C.) 289, and United States v. Onondaga Bank (D. C.) 39 Fed. 259. The first of the two cases passes with those we have already explained, because, at page 297 of 2 Mackey, the opinion observes that the notice given "seems reasonably prompt, unless there are peculiar circumstances in the case that made it otherwise." In this case the defendant bank was notified within six days after the forgery of the indorsement in question was discovered. In the second case various authorities cited by us are referred to, but notice was given within three days after the forgery or fraud was discovered. All the court says on the point before us is that notice was given as we have observed.

There is an allusion to this topic in Zane on Banks & Banking (1900) 271, which leaves it in precisely the same form as left by Daniel, giving the rule as we give it, with the additional statement as to certain authorities precisely as stated by him.

Some of the cases in discussing the matter differ as to the equities under circumstances like those before us. Some hold that the loss should be allowed to remain where it fell. However this may be, any demand for prompt notice in cases of forgeries is wholesome. When discovered, forgeries should not be coddled, but should be made known, both to the public prosecutor and to those immediately concerned; and any attempted test with reference to the question whether the party from whom recovery is sought has suffered by delay is wholly unsatisfactory, because the determination whether one who has suffered by a forgery may recoup himself is more a matter of chances, which cannot be estimated, than the result of logical investigation of particular facts.

Consequently, if this were a case of commercial paper proper as known to the law of merchants, and between individuals, it is established that unreasonable delay in giving notice after the discovery of the forgeries would have discharged the Exchange Bank, without regard, ordinarily, to any question whether it suffered damage

thereby. This, of course, is an exceptional rule, applicable to distinctly commercial paper, because, with regard to liability for money paid on a signature supposed to be genuine, but forged, or paid under any other mistake, in ordinary transactions, it is admittedly necessary that damage should have ensued by reason of any alleged negligence in giving notice of the facts. In conclusion as to this topic, the rule, as we understand it, is in entire harmony with the fundamental principles of that portion of the commercial law which relates to giving parties to commercial paper notices of defaults. They insist on promptness, but ordinarily require no proof pro or con on the question whether damage resulted from delays.

In the Circuit Court, and also as the case was first argued before us, no claim was made that there is any distinction arising from the fact that what are in question here are what might be called "treasury warrants," instead of "checks," or from the further fact that the party who relied on the forged or false indorsements was the United States. The case was submitted in all respects as though the drafts were commercial paper, and the litigation between private individuals. In that view, the only noticeable point was that the exceptional rule in reference to commercial paper had been overlooked. At the conclusion of the arguments we hesitated because we doubted whether, in any view, the United States could lose any rights by laches, and, again, because the payments made to the Exchange Bank were on paper which might well be called treasury warrants. Therefore the case was reargued, but we received therefrom little light of value.

The first doubt is met by Cooke v. United States, 91 U. S. 389, 23 L. Ed. 237, where it seems to have been settled that in the event officers of the United States are authorized by statute to issue what is in form commercial paper, and do issue it, the relations of the United States thereto are the same as those of individuals. The other doubt is not removed by Cooke v. United States, and it is the more serious one. The usual rule is that when an officer of a public corporation, be it state, county, or town, draws upon another officer of the same public corporation for the purpose of discharging a public liability, whether the draft is by authorization of statute or by settled usage, it is ordinarily known as a "warrant," and is not commercial paper in the sense of the law merchant; and no peculiar estoppel arises with reference to it. On the other hand, with mere warrants, the peculiar advantages of the usual recourse to indorsers which apply to commercial paper according to the law merchant ordinarily fail. Consequently the United States gain in certain respects by regarding drafts like this in question as commercial paper—that is, as checks—while the disadvantages arising therefrom are relatively small. For this reason, and for some other reasons, some of the statutes, if not all of them, especially section 4765 of the Revised Statutes [U. S. Comp. St. 1901, p. 3285], describe the instruments in question here as checks. It was apparently assumed by the Circuit Court, and it certainly was not contravened by the United States until we ordered this case reargued, that the paper in suit is strictly commercial; and the same was assumed in cases which we have cited in which the United States were concerned. We may refer especially to United States v. Central

National Bank and United States v. Clinton Bank already explained, in which drafts of paymasters on Assistant Treasurers of the United States were in question.

Under all the circumstances, whatever might otherwise be our doubts, we think we are controlled by the decisions of the federal courts which we have cited. These, although all in the Circuit Courts, constitute such a weight of authority, uniform for so long a period, that we cannot disregard them.

· Inasmuch as the facts in this case have been agreed to by the parties, and a jury was waived, we are able to render a final judgment on the record before us. Pullman's Car Company v. Metropolitan Railway Company, 157 U. S. 94, 112, 15 Sup. Ct. 503, 39 L. Ed. 632; Meyer v. Richards, 163 U. S. 385, 415, 16 Sup. Ct. 1148, 41 L. Ed. 199. Saltonstall v. Birtwell, 150 U. S. 417, 419, 14 Sup. Ct. 169, 37 L. Ed. 1128, is an exceptional case for the reasons stated in the opinion rendered by the Chief Justice.

The judgment of the Circuit Court is reversed, and the case is remanded to that court, with directions to enter judgment for the defendant.

ALDRICH, District Judge (dissenting). It is at least doubtful whether judgment ought to go against the government under the circumstances of this case. The moment the United States had paid the Providence Bank money through mistake upon pension checks bearing forged indorsements, there was created in its behalf by operation of law the right to recover it back. The question is, therefore, whether the United States has lost the right. The right might be lost, perhaps, under an effective state of facts upon the ground either of estoppel, laches, or negligence. The majority opinion proceeds upon the idea that the government cannot recover, because it failed upon discovery to give prompt notice of the forgeries and make demand for repayment. It seems to be conceded, and it is unquestionably true, that want of prompt notice in a case like this is not governed by the peremptory and necessary dogmatic rules prevailing in commercial law in respect to bills and notes and other commercial paper circulating in trade. Neither is it a case in which the government has lost its right through estoppel, because it is not a case where it is shown that the bank was in any way damaged by the delay on the part of the government in giving notice, and loss or damage is understood to be a necessary element of estoppel by conduct. If the government, therefore, has lost its right of recovery, a right which at one time existed, the loss of the right came by reason of negligence or laches resting in the failure to give notice. So it is not a case where diligence is an element of the plaintiff's case in establishing his right, because the right of recovery resulted by operation of law from the fact that the payments were made upon forged indorsements through mistake, and thus it follows, as it seems to me, that the negligence comes into the case as an element of the defense rather than as a necessary element in the plaintiff's case. Delay being a matter of defense, it is difficult to see why it should operate to bar recovery, unless the party receiving the money on forged indorsements has been damaged by the delay.

Again, this is not a situation in which prompt notice is required under commercial rules to charge an indorser, as such, upon an instrument. The precise questions are whether laches or negligence are imputable to the government in a case like this, and, if so, whether a defense results upon such ground by operation of law in favor of a party who, through his own error or mistake, has collected money from the government upon forged indorsements upon pension warrants or checks, and who, without proof of change of position or of injury, relies solely upon failure of the government to give prompt notice of the discovery of forgery.

I am aware that the doctrine of the old maxim, "Nullum tempus occurrit regi," as well as the ancient and somewhat broader doctrine that negligence is not imputable to a government, is somewhat relaxed. Still I am not willing to adopt the idea that the authoritative decisions go beyond what is said in Cooke v. United States, 91 U. S. 389, 398, 23 L. Ed. 237. In that case the court, after stating the general rule that laches is not imputable to the government in its character as sovereign, apparently so far limits the general rule as to allow laches and negligence to operate upon situations involving commercial transactions, and the exceptional rule in respect to commercial transactions was apparently adopted as subject to an important qualification; that is to say, that laches or negligence only operate against the government, provided a particular official has been specially charged with the performance of a duty which he neglects with consequent loss. That idea seems to have been carefully safeguarded as a qualification upon the limited rule in the following paragraph on page 398 of 91 U. S. (23 L. Ed. 237):

"Generally, in respect to all the commercial business of the government, if an officer specially charged with the performance of any duty, and authorized to represent the government in that behalf, neglects that duty, and loss ensues, the government must bear the consequences of his neglect. But this cannot happen until the officer specially charged with the duty, if there be one, has acted, or ought to have acted."

Furthermore, I do not accept it as at all clear that payments upon pension warrants or pension checks, if they are checks, which in a sense relate to a government bounty or gratuity, thus presenting a situation sui generis, should be treated as things relating to a commercial transaction, in respect to which the government comes down from its position of sovereignty and enters the domain of commerce within the view of the expressions of the Supreme Court in Cooke v. United States. There are hundreds of thousands of pension warrants or checks spreading over the entire country, which, under existing conditions and for the convenience of pensioners, are cashed at local banks. There is at least some shadow of duty upon the local banks to know whether the pensioner is dead or alive, and whether the indorsements are genuine or forged.

It must often happen, as is shown in this case, that payment through mistake is in one department of the government, and discovery of the forgery in another, and, so far as seen, it is not expressly made the special duty of a particular official to give notice. It is difficult, therefore, to see what particular officials are remiss. Indeed, the

majority opinion, in the concluding paragraph upon the defense of negligence, looks upon the question as one which would involve doubt if not controlled by decisions in the federal courts. It does not seem to me that either the proposition that negligence applies as a general rule to government transactions of this character has been settled by controlling weight of authority, or that it ever has been distinctly decided by the United States courts in a case like this that the defense of mere government delay is an available one in the hands of a party who shows no loss.

I will first call attention to the cases upon which the majority opinion seems to rely. The case United States Bank v. Bank of Georgia, 10 Wheat. 333, 6 L. Ed. 334, related to fraudulently altered bank notes circulating in affairs of commerce, and involved in a general account between two banks, and therefore is not in point here.

The case of United States v. Central Bank (D. C.) 6 Fed. 134, was not a pension case, but one involving commercial paper drawn in favor of an individual by a paymaster in the army, presumably for army supplies. The decision was one apparently without consideration further than to accept the commercial situation there as controlled by the commercial situation involved and passed upon in Cooke v. United States.

In United States v. Clinton National Bank (C. C.) 28 Fed. 357, the defendant pleaded a delay of 10 years after notice and loss by reason of the delay. To this the plaintiff demurred, and the case was accepted as one controlled by Cooke v. United States. The effect of the demurrer was an admission that the bank had suffered actual loss by the delay.

I do not purpose to attempt an analysis of the decisions further than to call atention to the fact that the Clinton Bank Case, decided by Mr. Justice Brewer when a circuit judge, was the only case involving a situation relating to a transaction in the nature of a sovereign gratuity or pension. That case was one of bounty, and perhaps stands as something in the nature of a pension rather than something in the domain of commerce, and it is important to note that actual loss was sustained by the bank. Loss was an important element, and one thus making it an entirely different case from the one at bar.

Now, on the contrary, we have the case of United States v. National Bank (D. C.) 6 Fed. 852, 854, where the exceedingly well-reasoned opinion was by Judge Choate, in which he points out the distinction between recovery for money paid for counterfeit money and for money paid on fraudulently indorsed drafts, and rests the decision upon the idea that delay in giving notice in the case of a draft for bounty is not a complete defense if unattended with loss. The case of Onondaga County Savings Bank (D. C.) 39 Fed. 259, was a pension case where the payment was upon forged pension drafts, and upon full consideration was decided favorably to the government upon the theory that the mistake was a mutual one where parties were equally ignorant, and thus a situation in which there was no greater obligation upon one party than the other to discover the death of the payee and the forgery. Judge Cox's decision also involved an examination of United

States v. Clinton National Bank (C. C.) 28 Fed. 357, and United States v. Central Bank (D. C.) 6 Fed. 134, which he points out as the two cases in which the defendant succeeded, and that in one case there was a delay of 12 years in giving notice after knowledge, and in the other, which was Judge Brewer's case, that there was no notice whatever.

The case of United States v. National Bank of the Republic, 2 Mackey, 289, 296, in the Supreme Court of the District of Columbia, is likewise useful, because it points out the distinction between different kinds of negotiable commercial paper in respect to which the reason for notice is to charge in contract upon the instrument or indorsement, and situations like this, where the recourse is to recover money paid under mistake, where the right rests more upon equitable grounds.

Query whether the doctrine of imputable government negligence does not depend more upon the question whether the subject-matter of the check or treasury warrant relates to a purely sovereign act, or, on the other hand, to something within the domain of commerce, than upon the mere form and transaction of the check or warrant itself. The subject-matter of Cooke v. United States, which was treasury notes circulating as commercial paper, was something clearly in the domain of commerce, and query, whether the medium adopted by the government for distributing the pension fund is not something relating to a pure act of sovereignty. Apparently a question like that involved in this case has not yet been dealt with by the Supreme Court. Surely Cooke v. United States does not deal with any such question, because it expressly limits itself to situations where the government comes down from its character as sovereign, and enters the domain of commerce.

It would be an inequitable hardship upon the government, thus discharging a beneficent obligation under circumstances necessarily affording a field of opportunity for deception and fraud difficult to discover under the inherent defects of government agencies resulting from lack of direct individual or official responsibility, to apply the equitable doctrine of laches as a defense in favor of a party who had received money from the government on forged indorsements, and who had not been damaged by the delay in ascertaining the fact of the forgery and giving immediate notice, and it would be an unnecessary and unreasonable legal hardship upon the government, under such circumstances, to have a hard and fast rule that delay shall be an available defense in behalf of one who has not been damaged. At least, in such a sui generis situation, in order to make delay an available defense, it should be incumbent upon a party to show that he has suffered some damage. From the very nature of the situation, in affairs of government, there must necessarily be more delay than in ordinary commercial affairs, where the discovery and the duty are direct and individual, and in such government situations a defense upon the ground of negligence should depend upon showing that the party has suffered loss or inconvenience.

The delay here was not very considerable, and surely not so much as to create a defense upon the ground of laches; and query, it not being a situation governed by commercial law, whether the delay was

sufficient under the circumstances to become an available defense upon the ground of negligence.

But, quite aside from the question as to how far negligence in respect to sovereign acts is imputable to the government, it is well to consider the effect of mere delay in other and different situations without proof of resulting loss. Daniel on Negotiable Instruments, at 1372, in dealing with questions relating to commercial paper, asserts the reasonableness of the wiser and juster doctrine that mere space of time is not important, provided loss or inconvenience does not result.

Where money is paid by mistake upon forged instruments in transactions not governed by legal rules in respect to general negotiable paper, the right of recovery seems to be accepted as one immediately attaching by force of law, and the delay in giving notice is generally accepted as a matter of defense to be set up against recovery, and its effectiveness as a defense seems to depend upon loss. This being so, the burden would seem to be upon the defendant to show the loss. Under such circumstances mere lapse of time and mere delay without prejudice are often spoken of both in England and in this country as of little consequence (18 Am. & Eng. Encyc. 101, note 4; 5 Cyc. 547 [c], and note 42), and injury is often accepted as an element of the defense which prevents recovery by reason of failure to act promptly in giving notice (5 Am. & Eng. Encyc. 1069, notes 1, 2).

In the Circuit Court, before Judge Lowell, this case was decided for the government upon the ground that delay unsupported by proof of loss was not a defense. Numerous authorities are cited in the opinion of that court. 141 Fed. 209. Quite likely some of the authorities which relate to situations where prompt notice was necessary to create liability may seem not to support the proposition. But such a situation is not at all like the case at bar. If the defense prevails here, it is upon the severe ground that the government has through delay forfeited an existing right created by law from the mere fact of payment upon forged paper under a mistake, and the forfeiture will be made to operate in favor of one who has not shown that he was injured by the delay; and query whether such an inequitable and embarrassing rule in sovereign affairs would not be too arbitrary and abstract in its application to a government, which in its character as sovereign is endeavoring to distribute something in the nature of charity.